Lincoln *v.* Buckmaster.

---

HIRAM W. LINCOLN *v.* JOHN BUCKMASTER.

*Lunatic. Negligence. Good faith.*

If one contract with a lunatic, and under such contract furnish him money and render him services, which, however, prove of no benefit to him, he cannot recover of the lunatic therefor, even though he in good faith supposed him to be sane, provided the circumstances known to him in regard to the other's mental condition were such as to convince a reasonable and prudent man

of his insanity, or even to put him on an inquiry by which he might, if reasonably prudent, have learned that fact.

One may act in good faith and still be guilty of gross negligence.

The liability of lunatics upon their contracts with parties ignorant of their lunacy discussed by REDFIELD, Ch. J.

BOOK ACCOUNT.    The account presented by the plaintiff was for money lent the defendant and for the plaintiff's services and expenses while in the employment of the defendant.

The auditor reported the following facts:

The defendant admitted that the plaintiff had lent and paid out the money and performed the services as charged in his account, but objected to the allowance of the same on the ground that at the times of lending the money and performing the services the defendant, from mental alienation, was incapable of making a binding contract, and wholly unfit for the transaction of business, and that this was known by the plaintiff.

It appeared from the evidence introduced on the trial, that for many years prior to May, 1854, the defendant had been an active and successful business man of sound judgment as to the value of property; that he had been engaged in the mercantile business, but had not been in the habit of buying horses for market and had not dealt much in that kind of property; that about the first of May, 1854, the defendant commenced buying horses for the purpose of sending them to market; that he had no use for them in his own business except to sell at a profit; that he became very much excited on the subject of trade and speculation, and more particularly in relation to horses; that he soon had bought eighteen horses mostly unfit for market, and at extravagant prices; that he valued them much above the prices paid and was expecting to realize a large profit in these transactions; that the defendant was at home but a small part of the time; that he was up a good deal during the night and took but little sleep; that about the 13th of May, 1854, the defendant's family became alarmed at his course of conduct, and sent for one Ketcham, his son in law, who came and devoted the most of that month and the early part of June in taking care of the defendant's property and in endeavoring to prevent his trading, and also in returning the

horses that the defendant had bought, and in disposing of them as he found opportunity; that before any of the charges were made by the plaintiff, the defendant, through the advice and persuasion of friends, had in the latter part of May, 1854, assigned his personal property, including the horses he had bought, to Ketcham, and had promised to give up trading and speculating; that the plaintiff and defendant both resided in the same town, and it was generally known there that the defendant's family and friends at that time thought the defendant was not in the exercise of his ordinary faculties, and regarded him as unfit for business, and were endeavoring to keep him from trading, and that the plaintiff was informed as to these circumstances, but thought the defendant as capable of managing his own business as he ever had been. On the 3d of June, 1854, the defendant agreed with one Huntoon to purchase of him a span of horses at four hundred and fifty dollars, but the trade was not fully consummated on that day, either by delivery of the horses or the payment of anything to bind the bargain. A day or two after this, Huntoon and the plaintiff (who was Huntoon's son-in-law,) came to the defendant's house and there (in the presence of the plaintiff) had further negotiations with the defendant about the sale of said horses. A trade was, on this occasion, finally consummated, by which it was agreed that the defendant was to have the horses at the depot in Shrewsbury the then next Tuesday morning, and there place them in the care of the plaintiff, who was to take them to Boston by railroad and assist the defendant in selling and disposing of them in market, the defendant at the same time agreeing to pay the plaintiff for his services and his expenses. The plaintiff was to keep the horses in his own possession and not to deliver them to the defendant till the defendant paid for them. The defendant intended to go to Boston and was expecting to receive money as soon as he arrived there to pay over for the horses. Before this trade was finished at the defendant's house, which was on about the 6th of June, 1854, and while Huntoon and the defendant were negotiating about the same, Ketcham told Huntoon, in the presence of the plaintiff, that the defendant was not fit to do business; that his personal property was in his, Ketcham's, hands, and that if any trade was to be

made it must be made with him.   The plaintiff thereupon asked Ketcham what authority he had over the defendant, and said to him that they had always considered the defendant capable of doing his own business, and it appeared that the plaintiff did believe the defendant fit to transact his own business at that time. The trade for the horses was, however, afterward on the same day completed, and the defendant borrowed of the plaintiff ten dollars to pay to Huntoon to bind the bargain, and paid it over to Huntoon in the plaintiff's presence, but it did not appear that the plaintiff knew for what purpose the defendant wanted this money.    This ten dollars constituted the first item in the plaintiff's account.   The horses were at the depot on Tuesday morning as agreed, and were placed by Huntoon and the defendant in the care and keeping of the plaintiff, and the defendant at this time borrowed of the plaintiff ten dollars more for his expenses to Boston, which was the second item in the plaintiff's account. The plaintiff took the horses by cars to Boston on that day, paid the expenses and spent the time as charged in his account in taking care of and in selling and disposing of them, which charges were reasonable in amount.    The defendant went to Boston the same day, expecting to get money there to pay for the horses, but did not obtain it, and soon returned to Vermont.    While the defendant was in Boston he gave the plaintiff directions to sell the horses for six hundred dollars, and at another time he gave different orders.   The day before he left Boston he directed the plaintiff not to sell them for less than one thousand dollars ; but the plaintiff did sell them for four hundred and fifty dollars, but on taking them out to deliver them to the purchaser, one of them proved to be slightly lame, and fifty dollars were retained on that account by the purchaser, so that the plaintiff in fact received only four hundred dollars for them.   The plaintiff had been in the habit of taking horses to the Boston market more or less for years previous, and was well acquainted with the market value of these horses, and was a suitable person to take charge of such business, and acted in good faith in selling and disposing of them as he did, and sold them for their full value.   The plaintiff took the whole care and charge of the horses in Boston, as by the terms of the contract between Huntoon and the defendant he had

Lincoln v. Buckmaster.

agreed to do, and exercised a good discretion and used due diligence in selling and disposing of them, but on one or two occasions he refused to comply with the defendant's request, to take them out to show to persons proposing to purchase, on the ground that the times and places were not proper. The defendant was not then in a proper condition to do business, and the plaintiff in refusing the defendant's request at those times, acted in good faith, and for the interest of the defendant. The plaintiff returned to Vermont soon after the sale of the horses, and on the 17th of June, 1854, the defendant called on Huntoon and gave him a written order on the plaintiff for the four hundred dollars, and at the same time gave his note for forty dollars which was the balance due for the horses to Huntoon, and the plaintiff paid over to Huntoon the four hundred dollars on such order. On the same occasion the defendant told the plaintiff he would settle and pay him at another time. The plaintiff had agreed with Huntoon to take this span of horses to Boston for him and sell them for him if Huntoon should not succeed in disposing of them himself.

The auditor further reported that from the evidence he found that from the early part of May to the first of July, 1854, and at the time of the sale of the horses above mentioned by Huntoon to the defendant, and at the time the plaintiff's account accrued, the defendant was, by reason of partial insanity and the loss of his usual and ordinary judgment as to the value of property, and particularly in relation to trade and speculation in horses, wholly unfit to do business, and was incapable of making a binding contract in such kind of property, and that the plaintiff was so informed by Ketcham before the accruing of any part of the plaintiff's account; that the defendant was in fact in the same state of mind on the 17th of June, 1854, when he gave Huntoon the written order and his own note, as before stated, and promised the plaintiff to settle and pay his account at some other time; that the plaintiff acted in good faith in lending the defendant the money charged in the first two items of his account, and in paying out and expending the money, and in performing the services as charged in his account, honestly supposing and believing that the defendant was as capable as ever of transacting his own busi-

ness and making contracts, but that in fact, the money lent and advanced, and the services performed by the plaintiff as charged, were of no use or benefit to the defendant in the situation he then was.

Upon this report, the county court, at the March Term, 1858, —PIERPOINT, J., presiding,—rendered judgment for the defendant, to which the plaintiff excepted.

*W. H. Smith* and *David E. Nicholson,* for the plaintiff.

*Linsley & Prout,* for the defendant.

REDFIELD, Ch. J.   The facts found by the auditor in this case, in his final summing up, are, that at the time of the sale of the horses by Huntoon to the defendant, he was, by reason of partial insanity and the loss of his usual and ordinary judgment as to the value of property, and particularly as to trade and speculation in horses, wholly unfit to do business and was incapable of making a binding contract in such kind of property, and that the plaintiff was so informed by the defendant's family before the accruing of any part of his account, and that the defendant continued in the same state until the close of the whole transaction, by giving Huntoon an order for the money and his note for the balance of the agreed price of the horses.   Then follows the plaintiff's side of the case, which seems not very consistent with all that goes before ; that the plaintiff acted in good faith in lending the money and performing the services charged, supposing at the time that the defendant was competent to contract, but that in fact neither the money nor the services charged were of any use or benefit to the defendant in the state he then was.

We must then assume in this case, for the auditor so finds, that the plaintiff really did, in some way, believe that the defendant was of sound disposing mind, and altogether capable of making binding contracts, and, possibly, that in lending him the money, and performing the service he was rendering him a useful and valuable service, however strange it may seem in connection with the other facts reported by the auditor.   But this is not sufficient to enable him to recover compensation of a lunatic.   If he had received no notice whatever of the defendant's infirmity, and even had no suspi-

43

cion of it, it will not render his contracts binding, as such.
When one is in the state of mental unsoundness found in this
case, he is wholly incapable of making a binding contract, as
much so as an infant, or a married woman. Any other view of
the case would be absurd almost.   It certainly shocks all our
notions, either of justice or reason, and equally of law.

. But notwithstanding this incapacity to make contracts, the law
recognizes many legal obligations, which for his own benefit, or
that of others connected with and dependant upon him, or from
considerations of policy, the lunatic may assume, and which will
form the basis of an action, in the courts of law and equity.   But
we shall find that this is allowed chiefly for the protection and
support of the lunatic, or his family, or to prevent serious injus-
tice to those who have dealt with him, having no means of know-
ing or learning his incapacity.   But this is never done to the
wrong and injury of the lunatic.   His mental infirmity is a full
protection against all injustice, but it cannot be made the occa-
sion of inflicting injustice upon others, who are without fault,
unless that result is necessary to protect the rights of the insane
person.   POLLOCK, Ch. B. in *Gire* v. *Gibson*, 13 M. & W. 625.

I. There is a class of cases where merchants have purchased
goods, in the ordinary course of their business, and on credit,
while they were in fact insane, but without any suspicion of
the fact, on the part of the seller, and where the goods cannot be
restored to the seller.   In these cases the lunatic has been held
liable for the value of the goods.    *Beals* v. *Lee.* 10 Barr. 56 ; *Mol-
ton* v. *Comroux*, 2 Exch. 502, S. C. 4 *id.* 17.   But this I appre-
hend is not on the ground of the contract, but because the luna-
tic has enjoyed the benefit of the goods, and cannot now restore
them.   He is made liable for the goods which he has put to his
own use as for a tort, the same as if he took them without leave.

So, too, where the plaintiff has supplied the defendant, being a
lunatic, with necessaries suitable to his circumstances, if done in
good faith, believing the party needed them, he may recover.
Some of the cases hold this, if the plaintiff was wholly ignorant
of the infirmity.   *Baxter* v. *Earl of Portsmouth*, 5 Barn. & Cr.
170.   But upon principle, in such a case, it would seem one
might always supply a lunatic, or his family, with necessaries

Lincoln *v.* Buckmaster.

for his support and care and for the maintenance of his family, even although aware of his infirmity. But it should be done, of course, with the concurrence of the near friends of the lunatic, whose duty and right it is to direct in regard to such matters. This right to supply necessaries to lunatics will not justify any one in crediting them with what might otherwise be necessaries, so long as they are rightfully under the care and control of family friends, on the ground that they are not properly supported, any more than one can so interfere in the mode of clothing and educating infants, while under the care of their natural or legal guardians. All the cases hold this.

And some of the American cases go the length of holding that no recovery can be had against a lunatic, upon a contract, express or implied, unless for necessaries. *Seaver* v. *Phelps*, 10 Pick. 304 ; *Fritzgerald* v. *Reed*, 9 Sm. & Marshall ; *Pearl* v. v. *McDowell*, 3 J. J. Marshall, 658.

It seems to be the practice of courts of equity not to interfere to set aside the contracts of lunatics which have been executed, and where it is impracticable to restore the parties to their condition before the contract, unless the party contracting with the lunatic obtained an unjust advantage in the contract, or knew of the infirmity ; *Niel* v. *Morley*, 9 Vesey 478. The reason assigned here for not interfering is the impracticability of doing full justice under the circumstances. The parties are left to their legal rights ; *Segeron* v. *Leaky*, 2 Atk. 412. This was an application to set aside a disposition of property made by the lunatic with the approbation of his only son, and which seemed to be beneficial to the lunatic, and the court declined to interfere.

It is evident from a careful examination of the decided cases that the law is not fully settled as to the extent of the liability of lunatics arising out of contracts.

The equity cases referred to above, and others which have followed them, hold very distinctly that courts of equity will not interfere to set aside the contracts of lunatics, made with those who had no reason to believe them such at the time the contracts were entered into, and when they have been fully executed, upon both sides, and the parties cannot now be restored to the condition in which they were in before the contract. And the same

rule obtains at law, when the action is brought to recover back what the lunatic has done under the contract, and thus to rescind a contract executed on both sides. The case of *Molton* v. *Com-roux*, 2 Exch. 486, where the lunatic sought to recover back premiums which he had paid upon the insurance of his life, is of this character. The contract had been fully executed on both sides in good faith, and without any ground of suspicion on the part of the insurers, that they were selling the annuities to one not fully competent to contract.

The opinion of the learned Chief Baron is full and explicit upon this point. "We may safely conclude," said the learned Judge, "that when a person apparently of sound mind and not known to be otherwise, enters into a contract for the purchase of property, which is fair and *bona fide*, and which is executed and completed, and the property, the subject matter of the contract, has been paid for and fully enjoyed and cannot be restored so as to put the parties in *statu quo*, such contract cannot afterwards be set aside." But the court here expressly decline to lay down any general proposition short of this. They decline to say that all executed contracts are binding upon lunatics if the other party is not in fault. This case is affirmed in the Exchequer Chamber, but upon the same narrow ground, that the contract was fully executed upon both sides, and that the action was brought to recover back what the lunatic had paid, without restoring what he had enjoyed under the contract, as the consideration for which he paid the money. This is precisely the principle upon which the equity cases above cited were decided. And it seems to me this is the only sound ground upon which it can fairly be said that courts of law or equity can treat the contracts of lunatics as binding, in any sense, and that only because it would be manifest injustice to allow the lunatic to enjoy the benefit of what he had received, and also recover back what he had paid. This is never allowed in the case of infants even. That point has been more than once decided by this court, in regard to infants; *Farr* v. *Sumner*, 12 Vt. 28; *Taft* v. *Pike*, 14 Vt. 405; *Weed* v. *Beebe*, 21 Vt. 495. Other cases still might be cited from our reports where the same principle is recognized.

And it seems to me that this is the only sound principle to

apply to the subject, considered merely in the light of a contract. I am confirmed in this view by the opinion of Mr. Justice WILDE, in *Seaver* v. *Phelps*, 11 Pick. 304, 306, who quotes with approbation the case of *Thompson* v. *Leach*, 3 Mod. 310, and adopts the language of that decision, " that the grants of infants and of persons *non compos mentis*, are parallel both in law and reason." And all who are familiar with the character of this very able judge will readily comprehend that this view was not expressed without the utmost study and deliberation. We have had few American judges so deeply versed in the principles of the common law as this eminent jurist, and fewer still perhaps who have left on the reports so many opinions, so carefully studied or correctly written.

The opinion of Prof. GREENLEAF, 2 Evidence, sec. 369, is certainly entitled to great consideration, for he is confessedly the most reliable of all the American text writers, so much so that Mr. TAYLOR, in England, in preparing a new treatise upon the law of evidence, thought it necessary to copy literally almost the entire work, with no credit except in the preface, which is practically none at all. This is a compliment which no other American law writer has ever received. And this writer says, " it seems now to be generally agreed that the executed contract of such person is to be regarded very much like that of an infant, and that therefore when goods have been supplied to him which were necessaries or were suitable to his station and employment, and which were furnished under circumstances evincing that no advantage of his mental infirmity was attempted to be taken, and which have been actually enjoyed by him, he is liable in law, as well as equity, for the value of the goods.

But we are aware that some few cases have gone beyond this and held the lunatic liable for any goods which he had been so furnished with, by a party supposing him to be sane, and which he had used or disposed of, so that they could not be restored, without reference to the fitness of the goods for one in his condition. The case cited from the 10 Barr 56, is of this character. These cases, as before intimated, can only be vindicated, as it seems to me, upon the ground that a lunatic is liable for his torts, provided there is no fault on the part of the owner of the property injured by

him, in leaving it improperly exposed. This liability of the lunatic has been recognized in this State.

It goes probably upon the ground that the friends of the lunatic should see that he is properly restrained. And if the lunatic is held responsible for his torts, in taking and converting goods, without permission, there is no great hardship in subjecting him to the same degree of liability for goods converted to his use under color of a contract which he subsequently avoids, thus leaving the case much the same as if he had taken the goods without permission. But this kind of liability only attaches where the owner of the goods is altogether without fault. If the lunatic obtains possession of the goods through the neglect, and especially the gross neglect, of the owner, he cannot recover damages of the lunatic which resulted in any degree from his own carelessness. He might possibly recover in such a case to the extent of the actual benefit received by the lunatic, but not for a loss which occurred through his own carelessness, and which did not benefit the lunatic.

To apply these principles to the facts in the present case, it must be very obvious to all that the plaintiff can claim nothing on the ground of having furnished actual necessaries to the defendant, or indeed what was suitable and proper for him to have under the circumstances. The facts found by the auditor show that instead of being or proving useful or beneficial, they were no doubt positively detrimental. And it would seem that any man possessed of ordinary sagacity, after the admonition he received, might have understood the matter in that light. But the auditor says the plaintiff did not so regard it. He acted in good faith, but with great negligence and want of care.

The only remaining inquiry is whether the defendant obtained possession of the plaintiff's money and services, without any such want of care and diligence on his part, as a prudent and careful man would not have been guilty of in the management of his own business of equal importance? It seems to us there can be but one opinion in regard to this point. And this in no sense conflicts with the finding of the auditor that he acted in good faith. This one may do, and still be guilty of the grossest, the most flagrant negligence and want of care. This

has long since been settled in the English and American courts. For although gross negligence may be evidence tending to show bad faith, it is by no means the same thing. They often exist together in the same person in the same transaction.

Here there is a total loss for some one to bear. The defendant was wholly incapable of forming a correct judgment upon the subject. Of course he cannot be held responsible for his conduct on the ground of mere assent. No blame attaches to him, except for putting the plaintiff's property to his own use. His consent is no excuse for the plaintiff's want of care and prudence in the matter. Did the loss then occur from such want of care in the plaintiff? It seems so to us beyond all question.

Let us suppose the plaintiff to be wholly disinterested, and as to a lunatic he is bound to act in that light, after being informed of the fact, although he do not credit the information, and he is then affected with notice of all the other facts in regard to the defendant's insanity, which he might have learned upon reasonable inquiry.

Let us then suppose the plaintiff wholly disinterested and informed that the defendant's family and friends regard him as insane, and especially upon the subject of trading in horses, and that he is in fact buying the most forlorn and desperate class of horses all over the county, with a view to the market, and that in great numbers; and let us also suppose that the plaintiff is a man of reasonable sagacity and fairness, and that under all these circumstances he is applied to for the purpose of carrying into effect another horse trade, and he finds the owner of the horses unwilling to trust them to the defendant. He must be responsible for them until paid for or sold, and the price realized. Could we expect him to push the defendant into and through such a transaction as followed, unless he was looking to some other end or interest than the defendant's? Certainly not. The plaintiff cannot expect any one to pronounce his conduct prudent and careful and disinterested, as detailed by the auditor. It is impossible to arrive at any such conclusion by fair argument and induction. It may be he acted in good faith, but if he did he is certainly very careless and onesided. And if he has after full notice, through his own foolhardy rashness and folly, led a lunatic

into a transaction of this kind, from which no benefit has resulted to any one, unless it be Huntoon, he must be content to sustain the loss which resulted from his own folly, so far as he is himself concerned. It is impossible that any court should visit such a loss upon the lunatic.

It is not important to comment upon the other facts found by the auditor in the case. It would seem rather difficult to make all the other facts found stand consistent with the finding of good faith in the plaintiff. It is very obvious to me that the plaintiff did not treat the defendant as his employer and he a mere servant, and at the same time, as being capable of managing his own affairs.

1. He refused to exhibit the horses to customers when the defendant requested it, because he, the servant, thought it not proper.

2. When expressly instructed not to sell the horses for less than one thousand dollars, he sold them almost at the very same time for four hundred dollars, and without any change in the market, and only a change of fifty dollars, at most, in the horses, and when, by the sale, the defendant must lose some two hundred dollars !

3. He seems all along to have acted. in fact, as the agent, and in the interest of Huntoon, and on that side he seems to have been watchful, careful, and successful !

The horses are going to market and he going with them for Huntoon, and at the same time they did go too, as it seems, and Huntoon will not let them go unless the plaintiff goes with them and is responsible for the custody of them. He is then virtually Huntoon's agent, forced upon the defendant, after he is told of his insanity.

And what is the effect of the contract which he thus secures of this reputed lunatic, for the benefit of his former employer, and father-in-law ? It only amounts to a guaranty that the horses shall bring enough above four hundred and fifty dollars to pay all expenses of carrying to market, on condition that he shall have what they bring more ! This was the legal effect and almost the form of the contract. For they would not deliver the horses until paid for or sold, and then Huntoon should have four hundred and fifty dollars, the plaintiff all he had paid, and pay

JANUARY TERM, 1860. 665

Brintnall v. S. & W. R. R. Co.

for his services, and the remainder should go to the defendant. And this is the protection which the law accords to lunatics, or reputed lunatics, which those who thus deal with them choose to consider sane. We think if one will make such a contract with a reputed lunatic, he must incur the risk of his own rashness and carelessness, in not making proper enquiry and examination into the affair, when it turns out that the party was really *non compos*.

Judgment affirmed.