## MATTER OF BECKWITH.

*Lunatic — contract of. Costs — when not allowed in proceedings to supersede commission of lunacy.*

Where an attorney was retained by a person who had been insane a number of years, to institute proceedings to supersede a commission of lunacy, and the attorney who had known the insane person for a long time and knew him to be insane, and his mental condition not improved, commenced proceedings without consultation with the committee of the lunatic or any member of his family, and the proceedings were unsuccessful. *Held*, (1) that there was no contract for the services of the attorney which could be enforced against the lunatic's estate, such services not being for the benefit of the lunatic; and (2) that the court would not, as a matter of discretion, allow the attorney any sum whatever in payment for his services.

In such a case the question of granting or refusing costs rests in the sound discretion of the court, and they will not be granted unless the proceedings are for the benefit of the lunatic, and are instituted and prosecuted fairly and in good faith.

APPEAL by the committee of Richard Beckwith, a lunatic, from an order at the special term confirming the report of a referee.

In 1843, said Richard Beckwith became insane, and was sent to the asylum at Utica for treatment. He remained there between one and two years, at the end of which time he was permitted to return to his home in Jefferson county, his mind having improved, but he not being cured. Becoming worse again, he was returned to the asylum, and was again permitted to return home, improved in health but not cured. This was repeated several times. At last, in 1854, he was taken to the asylum, and has not since been permitted to return home. In the opinion of Dr. Gray, the superintendent, and the assistant physicians of the asylum, Beckwith is insane without lucid intervals, and has been since he was last admitted to the asylum. When not excited, he is entirely harmless, and until some of his delusions get possession of his mind, he talks quite rationally. But these delusions have never been removed, and at his advanced age it is not probable they ever will be.

One of these delusions is that he owns the State; another that he has occasional interviews with the Almighty. During the rebellion he told the officers of the asylum that he had the power to termi-

nate the war, and would do so if he' was permitted to go' to Washington, and to do it he would take command, and, with a body-guard of women, he would put an end to it in a very short time. All his delusions are not as extravagant as these, but they all indicate a disordered intellect that precludes the idea that he was, when the proceedings in this matter were instituted, sane, or ever can be.

In 1854, a commission *de lunatico inquirendo* was issued and executed, and he was found to be of unsound mind, and his son was appointed committee of his person and estate.

In February, 1871, George F. Carter, a counselor of this court, prepared a petition for Beckwith to sign, alleging his sanity, and praying that the proceedings by which he was found to be a lunatic be set aside, and his property restored to him. This petition was signed by Beckwith's making his mark, and it was verified before a notary public. It was accompanied by the affidavit of one or more physicians and of several non-professional persons, averring their belief of his sanity and capacity to manage his affairs. The committee opposed the motion on affidavits of Dr. Gray and the assistant physicians in the asylum, who were intimately acquainted with Beckwith, some of them having personal charge of him and prescribing for him, alleging him incurably insane.

The court made an order, referring it to O. S. Williams, Esq., to take proofs as to the sanity of said Beckwith, and he was directed to report the evidence taken by him to the court, with his opinion thereon. He returned the evidence, with his opinion that Beckwith was insane, and that he ought not to be set at liberty. The proofs fully sustain the conclusion at which the referee arrived. The report was confirmed and the motion denied.

While this reference was pending, an application was made by Carter to Dr. Gray to permit certain physicians to see and converse with Beckwith, with a view to enable them to testify before the referee as to his sanity. The doctor refused, because such examination excited Beckwith, prevented sleep, and affected injuriously his health, until the court should direct him so to do. Carter applied for and obtained such an order, and the physicians saw and conversed with Beckwith.

Carter also applied to the court to compel the committee to render an account, none having been rendered since his appointment, and also to compel him to acknowledge that he held, in trust, a

house and lot which he had purchased for the use of the family in Watertown, and the title to which he took in his own name. These orders were granted and an account rendered, and the existence of the trust admitted.

After these proceedings were concluded, Carter applied to the court for an order requiring the committee of Beckwith to pay him for his services and expenses in these proceedings amounting by his bill to $1,500. The court made an order referring it to Judge MASON to inquire and report what sum should be allowed to Carter for his services, with the evidence taken by him and his opinion thereon. The referee heard the proofs and allegations of the parties, and reported that Carter ought to be allowed $858.63. Exceptions were taken to the report, which were overruled, and it was confirmed, and from the order overruling the exceptions and confirming the report this appeal is taken by the committee.

Carter was allowed some $95 for services in proceedings to compel the committee to account and to acknowledge that he held the title to the house in Watertown in which the family of said Beckwith resided. This sum the committee paid.

Present—MULLIN, P. J., E. DARWIN SMITH and GILBERT, JJ.

MULLIN, P. J. A contract with a person not known to be of unsound mind and who has not been found, upon a *commission de lunatico inquirendo*, to be insane, may be sustained, if it shall be proved to have been fairly made and without advantage being taken of the lunatic. 2 Kent's Com. 451, and note 1. But neither money advanced nor compensation for services can be recovered against a lunatic if the circumstances were such as to put the party upon inquiry as to his mental condition by the reasonable pursuit of which his unsoundness of mind might have been discovered. 2 Kent's Com. 451, note; *Lincoln* v. *Buckmaster*, 32 Vt. 652.

It was held in *Fitzhugh* v. *Wilcox*, 12 Barb. 235, that after inquest and the appointment of a committee, all contracts by the lunatic are absolutely void. *Wadsworth* v. *Sherman*, 14 Barb. 169.

These propositions are subject to this modification, that the law will imply a contract on the part of the lunatic to pay for necessaries for the support of himself and his family. The case that has gone the furthest of any that I can find in holding the estate of the lunatic bound by contract for services, is *Wentworth* v. *Tubb*, 2

Younge & Coll. 537 (21 Eng. Ch. 537). In that case the lunatic had employed a solicitor to traverse an inquisition of lunacy, and he was unsuccessful. He applied to the vice-chancellor for an order directing the payment of his costs out of the estate. The application was allowed, the vice-chancellor saying although allowed in that case yet "if any thing fraudulent or unfair, or perhaps I may go as far as to say frivolous or litigious, appear to have taken place on the part of the solicitor, the court may say that no debt arises."

Carter says he was retained by Beckwith and by no one else. He neither consulted with the committee nor any member of his (Beckwith's) family. *They* knew his condition and could have informed him whether it was either wise or safe to set him at liberty. Dr. Gray, or any of the physicians or attendants in the asylum, could have disclosed to him Beckwith's mental and bodily condition, and the prospect, if any, of his restoration to health. No one was consulted, nor any effort whatever made to learn the truth in regard to Beckwith's condition before an expensive, tedious, and, to the children and friends of the family, painful litigation was begun.

Carter had lived neighbor to Beckwith — knew he had been insane for years, and that it was necessary to send him to the asylum. He saw him repeatedly after he (Carter) removed to Utica, and could not but know from his conversation that his mental condition was not improved.

He (Carter) admitted to Dr. Gray, after proceedings were instituted, that he knew Beckwith was insane, but justified his conduct because he thought he might be set at liberty and permitted to enjoy his property, and ought not to be longer detained.

With this knowledge it was shameful to act upon the retainer of Beckwith; it was a fraud upon his family, a fraud upon the court and a prostitution of the forms of law for his own personal pecuniary benefit, without a single chance of benefit to the client.

Knowing Beckwith to be hopelessly insane he induced professional and non-professional persons to swear that he (Beckwith) was, in their opinion, of sound mind and capable of managing his own affairs. These persons had only a very slight acquaintance with Beckwith, had never seen him when laboring under one of his delusions, and, honestly, I have no doubt, believed him to be sane. Carter knew better, and he presented their affidavits to the court as being true when he knew they were not.

When the fact was disclosed to the court that it had been so shamefully imposed upon, it owed it to itself, to the public, and especially to the unfortunate subject of the litigation and his family, to punish the person who did it.

If such conduct is permitted to go unpunished no insane person, no idiot, no infant who has property is safe. There are and always will be men hanging on to the skirts of the profession ready and willing to take advantage of the affliction that God in his providence has laid upon the idiot and lunatic to seize upon and appropriate their property to their own use, regardless alike of the laws of God and man, and of all sympathy for those who are deprived by' their villainy of bread to eat and clothes to wear.

There was no contract for the services of Carter which can be charged on his estate, but if there was the court will not enforce it because the services were not for the benefit of the lunatic, and Carter was guilty of fraud as well in procuring the employment as in the conduct of the proceedings.

It remains to inquire whether the court will, in the exercise of its discretion, direct the payment of any sum whatever to Carter as compensation for his services?

In the *Matter of Catharine Cumming*, 50 Eng. Ch. 537, it was held that it was a matter of right for a person found to be a lunatic upon commission to traverse the finding, but the court would nevertheless exercise control over the matter for the protection of the lunatic and his estate, and would satisfy itself that the proceeding was *in good faith*, and that the lunatic, when he seeks to traverse the finding, *is competent to judge of what he is doing, and is really desirous that the traverse shall issue.*

This rule applies to applications by the lunatic to supersede the commission as well as to applications for leave to traverse it. And had such an investigation been had in this case this litigation might have been prevented. It must not be inferred from these remarks that I intend to cast any reflection upon the action of my brethren who have taken part in these proceedings. The papers accompanying the petition were sufficient to disarm suspicion and to induce the court to order a reference to ascertain the actual condition of Beckwith.

It was not the fault of the court that counsel deceived it, and imposed upon it affidavits as true which he knew were untrue, although not known to be so by those who made them.

A personal examination in conformity to the English practice would have enabled the court to detect the imposition and thus quash the proceedings at the very outset.

Costs are not granted against a person who institutes proceedings to declare a person a lunatic and fails in them, if the prosecution has been in good faith. *Brower* v. *Fisher*, 4 Johns. Ch. 441. The same rule is applied when the attorney of the lunatic fails in an application to traverse or supersede the commission. *Matter of Folger*, 4 Johns. Ch. 169.

Indeed the question of granting or refusing costs rests in the sound discretion of the court and they will not be granted unless the proceedings are for the benefit of the lunatic, and are instituted and prosecuted fairly and in good faith. *Re McLean*, 6 Johns. Ch. 440; *Re Tracy*, 1 Paige, 580; *Re Van Cott*, id. 489.

In *Re Conklin*, 8 Paige, 450, a solicitor appeared for Conklin — against whom proceedings had been commenced to declare him to be a person of unsound mind — to oppose the same, but Conklin was found to be a lunatic at the time of the retainer of the solicitor. The solicitor applied to the court for an order directing the committee to pay him his costs incurred in such proceeding. The chancellor held the solicitor entitled to his taxable costs. He says, " As the person against whom the commission issued, has been found to be a lunatic at the time of the retainer, the solicitor has no claim against the estate on the ground of contract, as he is not a creditor of the lunatic, who was incompetent to make a valid contract to pay him for opposing the commission, and, as a general rule, the court will not allow the costs of an unsuccessful opposition, as the party who is really a lunatic is not benefited thereby. This court may, however, in its discretion, allow costs for opposing the commission when the fact of the lunacy is so much in doubt that the chancellor would have directed and sanctioned such opposition if an application had been made to him in the first instance. In this case it appears from the petition that there were reasonable grounds for believing that the party proceeded against was not a lunatic, and the committee do not appear to oppose this application, as it was their duty to do if they believed the allegations in the petition to be incorrect."

In no view of the case is the attorney entitled to costs ; on the contrary he should be compelled to pay the costs and expenses which the committee has been put to by reason of this most unjustifiable and unnecessary proceeding. It is only by inflicting

Matter of Beckwith.

severe punishment upon attorneys who use the courts of justice to strip their clients, who are incapable of protecting themselves, that they and their families can be protected against forays upon their property.

It may be said that the order of the court referring it to Judge MASON to inquire and report what sum should be allowed Carter for his services was virtually an exercise of the discretion of the court, and an allowance to the attorney of the costs of the proceedings.

If the order of reference could be held to have the effect of allowing the attorney's costs, it should be satisfied in view of the facts disclosed in this case by allowing the attorney six cents costs and no more, the amount resting entirely in our discretion in reviewing the order of confirmation. But if the order is to be held to allow the attorney costs, it was improvidently granted, being in violation of the long settled practice of the court in such cases. Courtesy should not constrain us to impose upon the estate of the lunatic so oppressive and unjust a burden as the allowance of the sum awarded by the referee would be.

In making this disposition of the case we are not to be understood as reflecting in the slightest degree on the action of the referee. He was not at liberty to inquire into the character of the proceedings or the motives that prompted the attorney to action. He was to inquire what the services rendered were worth, assuming them to be honest and fair, and we have no reason to find fault with the amount he has awarded to the attorney, if he is equitably entitled to any thing, which he is not.

The exceptions to the report of the referee are allowed, and the order of confirmation reversed, with $10 costs to be paid by Carter to the committee or his attorney, and the motion for confirmation is denied, and the order of reference vacated.

*Ordered accordingly.*