14668

WILLIAMS v. JEFFERSON STANDARD LIFE INS. CO. *ET AL.*

(196 S. E., 519)

*Messrs. Thomas, Lumpkin & Cain* and *W. C. Wolfe,* for appellant,

*Messrs. Lide & Felder* and *D. H. Dantzler,* for respondent,

April 13, 1938.

The opinion of the Court was delivered by Mr. Justice Bonham.

December 16, 1912, Jefferson Standard Life Insurance Company issued to Braxton Bragg Williams, denominated

in this case B. B. Williams, Sr., its policy No. 26715 whereby it insured him in the sum of $10,000.00. The policy lapsed about December 16, 1921, because of nonpayment of premiums. At that time its paid-up value was $2,375.00 and its cash surrender value was $1,606.00. B. B. Williams, Sr., departed this life, intestate, March 19, 1929. O. T. Williams and B. B. Williams, Jr., were duly appointed administrators of his estate. This action was begun March 6, 1935, for the recovery of the paid-up value of the policy, to wit, $2,375.00, together with $620.00 as interest.

For answer Jefferson Standard Life Insurance Company, which we shall call the Insurance Company, admitted the issuance of the policy, and its lapse, and the death of B. B. Williams, Sr., on March 19, 1929, and that the paid-up value of the policy was then $2,375.00 and that its cash surrender value was then $1,606.00.

For further answer, it alleged: That in November, 1926, B. B. Williams, Sr., applied to the defendant for the payment of the cash surrender value of this policy, viz., $1,606.00. In pursuance of this request, and on surrender of the policy, the insurance company paid him the said sum, the receipt of which he duly acknowledged, signed the release, and surrendered the policy.

To this answer, the plaintiff made reply, alleging: That at the time of the payment of the said sum of $1,606 to B. B. Williams, Sr., by the insurance company and the surrender of the insurance policy, Braxton Bragg Williams, Sr., was *non compos mentis*, had been legally so adjudicated and was then confined in the State Hospital for the Insane, and was incompetent and mentally incapacitated to enter into a valid contract and that such settlement and release of the policy was invalid.

To this reply, the insurance company filed an amended answer which reiterated the allegations of the original answer, and made the following additional allegations: That the cash surrender value of the policy, to wit, $1,606.00, was paid to and received by B. B. Williams, Sr., and the members of

his family and was used for the support and maintenance of the insured and his wife.

For further defense, it alleged that, if plaintiff had any cause of action, it arose during the lifetime of B. B. Williams, Sr., and that more than six years have elapsed since any cause of action accrued, if any existed, and the same is now barred by the statute of limitations, etc.

On the issues thus made by the pleadings, the case went to trial. It will be observed that the complant makes no reference to the receipt by B. B. Williams, Sr., of the amount of the cash surrender value of the policy of insurance. Only after defendant made plea of that matter did the plaintiff by reply allege that B. B. Williams was *non compos mentis,* and had been adjudged insane and committed to the State Hospital for the Insane, and that his contract to accept the sum of the cash surrender value of the policy and surrender it was void. Even then he does not allege that the insurance company had knowledge of any mental deficiency of B. B. Williams, nor that it had any actual or constructive notice thereof; nor that there was any fraud or overreaching of B. B. Williams by the insurance company.

The administrator, B. B. Williams, Jr., refused to be a party to bringing this action.

The plaintiff offered in evidence the policy in question, and the testimony of J. H. Hughes, the Judge of Probate of Orangeburg County, to prove the appointment of O. T. Williams and B. B. Williams, Jr., as administrators of the estate of B. B. Williams, Sr., and rested his case there.

The testimony of the defendant began with that of C. H. Williams, the oldest son of B. B. Williams, Sr., and from that time to the end of the testimony the effort of the plaintiff was directed to prove that B. B. Williams was insane, and that C. H. Williams, who had conducted the proceedings by which the insurance company paid the cash surrender value of the policy, had appropriated it, at least in part.

It appears that the check of the insurance company for that money was payable to B. B. Williams, Sr., was received

by him and indorsed by him; the proceeds were deposited by C. H. Williams, who testified that he gave it to his mother, who lent him a part of it; that it went for the support of his mother and father.

Then it was disclosed that this family was sorely divided in this affair. Of the administrators, one was plaintiff and the other defendant. The plaintiff was active in prosecuting the case; the defendant refused to have anything to do with it. Two other brothers did not appear in it; one of them a professor at the University of South Carolina.

On the part of the plaintiff, in the testimony in chief, and that in reply, not a syllable appears to show that the insurance company had any actual or constructive notice, at the time of the surrender of the policy by B. B. Williams and the receipt by him of the check for $1,606.00 in payment of the cash surrender value of the policy, that B. B. Williams was *non compos mentis,* or that he had been committed to the State Hospital for the Insane. All the crimination and recrimination between the brothers and sisters as to who got this money seems to us to be beside the vital issues of the case.

At the close of the testimony the insurance company moved the Court to direct a verdict in its favor on these grounds, to wit: (1) That full payment of every obligation due B. B. Williams, Sr., has been made by a check and release which are in evidence. (2) That, in order to recover in this case, plaintiff must prove fraud or imposition on the part of defendant, or its agent, or of undue influence in procuring the release. The plaintiff must show by affirmative evidence that defendant had knowledge of the mental condition of B. B. Williams or that he had been declared to be *non compos mentis.* (3) That, in order to recover, plaintiff must show that the parties can be placed in *status quo,* or that they have made a tender to put the parties in *status quo.* (4) That the contract is at best only voidable, and plaintiff has failed to prove it void. (5) That under Sections 6237 and 6241 of the Statutes, B. B. Williams was six

months after his parole on November 5, 1927, a sane man and could have brought this suit. It was filed in 1935, more than six years after the time for commencing this action, after the accrual of the cause of action, and the action is barred by the statute of limitations. (6) That the proof shows that B. B. Williams, Sr., was in good mind when he signed the release. (7) The testimony shows, without contradiction, that the money derived from the settlement of this policy was used for the support and maintenance of his father and mother, and the repayment for certain cash which he had paid out for them at their direction.

The Court disposed of the motion by saying:

"The record shows you made your motion. I am going to submit the case to the jury. On this issue of the statute of limitations that is entirely eliminated.

"Mr. Lumpkin: That is a question of law.

"The Court: Yes, sir."

At the request of the defendant, the Court charged the jury as follows:

"If the contract be fair and bona fide there is no element of fraud in it, and if the other party does not know of the insanity, and the parties cannot be placed in the position they occupied before the contract was executed by the same party there is no reason why the lunatic should be allowed to retain what he acquired under the contract and at the same time be allowed to escape from all liability out of it.

"In this case I charge you that there is no fraud, neither is there any proof that the defendant Insurance Company had any actual notice of any kind of the alleged insanity of the deceased B. B. Williams when he was paid the $1,-606.00.

"Every person is presumed to be sane and (one?) is not put on notice of insanity unless actual notice be brought home to a person who is contracting with an insane person."

The jury found for the plaintiff in the sum of $1,199.64.

A motion for new trial was made on the following grounds:

"(1) That the Court should have directed a verdict in favor of the defendant as prayed for.

"(2) That the jury disregarded the charge of the Court to the effect that there was no fraud or allegation of fraud in the case, and in the absence of such, the plaintiff should not be allowed to recover. Further, that the jury disregarded the charge of the Judge that if the contract in question be fair and bona fide and there be no fraud in the transaction, and no actual notice of insanity be brought home to the defendant company, then the insane person should not be allowed to retain what he has acquired under the contract in question and the jury should have under this charge found for defendant.

"(3) That the verdict as rendered by the jury was not responsive to the evidence, the pleadings, or the charge and should be set aside on the motion for new trial and a new trial granted."

The motion was overruled.

The defendant appeals on the following grounds:

"I. In that the trial Judge was in error in refusing to grant the motion for directed verdict made in behalf of the defendant company:

"(1) Because the testimony showed that without knowledge of any facts concerning any alleged mental infirmity the defendant company at the request of the insured paid the cash surrender value of the policy, $1,606.00, in November, 1926, and the insured signed a lawful release therefor before his son who was a Notary Public, thus discharging all liability of the defendant company.

"(2) The Court should have directed a verdict for the defendant company because in a case of this kind fraud or imposition on the part of the defendant company, or its agent, or undue influence in the taking of the release or instrument in question, must be pleaded and proved, and further that knowledge of the alleged mental condition must be alleged and proven before recovery can be had, and there

being no allegation or proof of these necessary elements, the Court should have directed a verdict as prayed for.

"(3) The verdict should have been directed on the further ground that a tender should have been made or offered by way of a return of the moneys paid when the release was given, and there being no allegation or proof of this the verdict should have been directed for the defendant company.

"(4) The Court should have granted the motion for a directed verdict on the further ground made that a contract with a lunatic is only voidable and to set it aside the plaintiff must allege and prove that it was not made fairly, or in good faith, that the defendant company had knowledge of the disability, and it must be alleged further and proven that upon a rescission the parties should be restored to the position they occupied, and having failed in these allegations and proof the directed verdict should have been granted.

"(5) The Court should further have directed the verdict on the ground as made, that under the law the insured, whether sane or insane, was entitled to have his money and property for his upkeep and living, and he was due to furnish support to his wife, who was then living, and the testimony showing without contradiction that the funds were received, taken and used for the benefit of the wife and the insured, and the testimony further showing that Braxton Bragg Williams knew what he was doing when he signed the release, that on this ground the defendant should be absolved from any liability, and the verdict should have been directed in favor of the company.

"(6) On the further ground that under the statutes of South Carolina, and particularly Section 6237 and Section 6241, Code of 1932, that Mr. Braxton Bragg Williams was duly paroled on the 5th day of November, 1927, from the State Hospital for the Insane; that under the law the insured was sane six months after his parole; that this suit was filed in 1935, more than six years after the time when the action should have been commenced, or after the accrual

of the cause of action, and the statute of limitations had run and the cause of action must fail, and the Court should have directed a verdict on this ground.

"II. Because the Court erred in refusing to grant the motion for new trial as made on the following grounds:

"(1) That the jury disregarded the charge of the Court to the effect that there was no fraud or allegation of fraud in the case, and in the absence of which the plaintiff should not be allowed to recover. Further, that the jury disregarded the charge of the Judge that if the contract in question be fair and bona fide and there be no fraud in the transaction, and no actual notice of insanity be brought home to the defendant company, then the insane person should not be allowed to retain what he has acquired under the contract in question without making restitution, and the jury should have under his charge found for the defendant.

"(2) That the amount of the verdict as rendered by the jury was not responsive to the evidence, the pleadings, or the charge and should have been set aside on the motion for new trial and a new trial granted."

From all this preliminary statement, we deduce the conclusion that the controlling questions which we are to decide are these:

Was it error to refuse to grant the motion for directed verdict?

Was it error to refuse to grant the motion for new trial?

We will treat the first question in line with the three first grounds of the motion for directed verdict.

There can be no particle of ground to gainsay the statement contained in the first ground of the motion that it is shown by the check and release that B. B. Williams, Sr., was paid $1,606.00, the amount of the cash surrender value of his policy, and that he signed the release and surrendered the policy. Plaintiff says that B. B. Williams, Sr., was incapacitated by mental defects to make such contract. If it be admitted that Williams was then insane, the plaintiff must go further in order to set aside that con-

tract and prove that the insurance company or its agents induced Williams' action in the premises by fraud, or imposition or undue influence. They must go even further and prove affirmatively that the insurance company or its agents had knowledge of the alleged mental unsoundness of B. B. Williams, Sr., or knowledge of a judicial proceeding which showed that he was mentally unbalanced and had been declared *non compos mentis.*

The presiding Judge charged the jury in these words: "Then, when the plaintiff replies to matters contained in the answer relative to the alleged release, when the plaintiff alleges that the release is invalid because of the alleged mental incapacity of the insured, then the burden of proof is on the plaintiff to establish that allegation, that is, the mental incapacity of the said B. B. Williams, by the greater weight or preponderance of the evidence."

Again, he charged this: "The plaintiff in reply to that affirmative defense and other affirmative defenses says that at the time of the alleged release and payment of the money in the sum of $1,606.00, and at the time of the surrender of the insurance policy, that B. B. Williams was *non compos mentis,* or mentally incompetent to enter into a valid agreement or contract and that therefore the alleged release was null and void. That is an allegation by the plaintiff and the burden of proof is on him to establish that."

The plaintiff offered in chief no evidence intended to establish the fact that because of insanity the release executed by B. B. Williams, Sr., was null and void. After the defendant had offered testimony to prove the circumstances attending the execution of the release, the plaintiff offered testimony to prove the insanity of B. B. Williams, Sr., but none of it was given by any person who was present at the time the papers asking for the cash surrender value of the policy were prepared; nor when the release was executed by B. B. Williams, Sr., C. H. Williams, the oldest son of B. B. Williams, Sr., managed the whole matter by and with the consent of Mrs. C. A. E. Williams, the wife

of B. B. Williams, Sr., and the mother of C. H. Williams. They were in no sense the agents of the Insurance Company. At the same time Mrs. C. A. E. Williams surrendered her policy in the same company and received the cash surrender value therefor, some $1,847.00. She received this mony and, according to C. H. Williams, she received that from the policy of her husband.

In order to declare the release signed by B. B. Williams, Sr., to be null and void, it must be shown by competent testimony that the insurance company knew of his mental condition, and either by fraud, or deceit, or undue influence induced him to sign the release.

The presiding Judge charged the jury that: "Where one has been committed to the asylum and someone else dealt with him without actual knowledge of his insanity and made a fair settlement with him, fair trade with him, and the insane person received full benefits of the transaction, why, he would have no legal grounds to set it aside, but where the person is adjudged insane and committed to the asylum by a Probate Court, which is a Court of record in this State, with proper jurisdiction, that would be notice to the person dealing with him while he was in the asylum of the fact that he was committed to the asylum."

There seems to be a hiatus in the last sentence. To make it understandable, it would require that it be written thus: "that would be notice to the person dealing with him while he was in the asylum, if the person so dealing with him was aware of the fact that he was committed to the asylum." That charge as thus amended would have been pertinent, if there had been any testimony to show that the insurance company had any knowledge of the fact that B. B. Williams, Sr.. had been committed to the asylum by the Probate Court; but there was no particle of such proof. Evidently, the Court meant to say that the records of the proceedings by which the Court adjudged B. B. Williams, Sr., insane and committed him to the asylum was "constructive" notice to the Insurance Company be-

cause that Court is a Court of record. The records of that Court are not constructive notice of their contents, unless they are brought to the notice of the person to be charged with notice, or facts are brought to his attention which put him on inquiry, which if pursued lead to knowledge of such facts. The statutes do not make these records *ipso facto* constructive notice. Deeds, mortgages, etc., are put on record in the registrar's office and by statute are made constructive notice to all persons subsequently dealing with the persons or property.

Constructive notice is thus defined in Black's Law Dictionary, 3d Ed., page 1258: "Constructive notice is a presumption of law making it impossible for one to deny the matter covering which notice is given."

"Constructive notice is a legal inference from established facts, and like other legal presumptions does not admit of dispute. It is in its nature no more than evidence of notice, the presumption of which is so violent that the Courts will not even allow its being controverted." 20 R. C. L., 340.

It will not be argued that this arbitrary rule of constructive notice, founded on presumption, should be enforced against one who is in complete ignorance of the facts from which the presumption arises.

"Constructive notice, strictly speaking, is ineffective unless there is a statute providing therefor." 20 R. C. L., 342.

As we have said, we know of no statute which gives to the records of the Court of Probate the effect of constructive notice. Usually those who invoke the power of the Probate Court to adjudge one insane seek to shun publicity thereabout.

"In some cases it has been said that constructive notice is a creature of 'positive law' or a 'creature of the statute,' ineffectual unless provided by statute, and that, to be of any force, the statute must be strictly complied with."

" * * * Constructive notice rests on a strictly legal presumption and may be a creature of positive law. The

same facts sometimes may be such as to prove both constructive and actual notice, that is, a Court may infer constructive notice and a jury may infer actual notice from the facts. There may be cases when the facts show actual, when they do not warrant the inference of constructive, notice." 46 S. J., 541.

It seems plain that one cannot be held to have constructive notice of facts from which the presumption of notice arises, who is wholly ignorant of those facts, and a knowledge of which is the necessary influence of his conduct, or actions in the premises.

It is not disputed in this case that the insurance company had no actual notice that B. B. Williams, Sr., was *non compos mentis,* or that he had been adjudged insane by the Probate Court and committed to the hospital for the insane.

It is pertinent to inquire, under such circumstances as pertain in this case, what are the relative rights of an insane person and those who contract with him in ignorance of his mental infirmity?

That acknowledged master expounder of equity, Chancellor Francis H. Wardlaw, discussed this question in an opinion delivered in the old Court of Appeals in 1855 in the case of *Sims v. McLure,* reported in 8 Rich. Eq., 286, 70 Am. Dec., 196. He said this:

"The grounds on which Courts of Equity interfere to set aside the sales, or other solemn acts of persons of unsound or weak minds, is, that fraud has been practised on them. Sto. Eq., § 227. A plaintiff seeking the aid of the Court in such case should state in his bill facts and circumstances impeaching each particular contract sought to be avoided. * * *

"Indeed, a fair contract, made with a lunatic by a third person without notice of the lunacy, will not be disturbed. *Baxter v. Earl of Portsmouth,* 2 B. & C. 170; *Neil v. Morley,* 9 Ves., 478; *Beavan v. McDonnell,* 9 Exch., 309; *Ballard v. McKenna,* 4 Rich. Eq., 358; *Keys v. Norris,* 6 Rich. Eq., 388."

Neither in his complaint nor in his reply to the answer does the plaintiff in this case set out "any facts and circumstances impeaching the contract" sought to be set aside.

In the case of *Langley v. Cease et al.*, 122 S. C., 203, 115 S. E., 230, 231, the Master of Barnwell County, H. L. O'Bannon, Esq., made so clear and comprehensive a report on all the issues of law and of fact that Circuit Judge Shipp adopted it as the judgment of his Court, and on appeal the Supreme Court adopted it as the judgment of that Court.

The action was one for the foreclosure of a mortgage; the answer alleged mental incapacity on the part of the mortgagor to contract. The Master made a compendium of the leading cases touching the rights of contracts by and with persons of unsound mind, including that of *Sims v. McLure*, from which we have just quoted. From the case of *Ballard v. McKenna*, 4 Rich. Eq., 358, he quoted the following: "If one enters, in good faith, into a contract with a lunatic, without knowledge of his lunacy, and in pursuance of the contract, renders him important services, whereby he is greatly benefited, though the contract be void, the party rendering the service is entitled to just and reasonable compensation."

From the case of *Flach v. Gottschalk Co.*, 88 Md., 368, 41 A., 908, 42 L. R. A., 745, 71 Am. St. Rep., 418, he quoted the following: "If the contract be fair and bona fide, and there is no element of fraud or imposition in it, and if the other party does not know of the insanity, and the parties cannot be placed in the position they occupied before the contract was executed by the sane party, there is no reason why the lunatic should be allowed to retain what he has acquired under the contract and at the same time be permitted to escape from all liability arising out of it."

The Master cites *Neil v. Morley*, 9 Ves., 478; 3 Pomeroy's Equity Jurisprudence, § 946; *Price v. Berrington*, 3 Macn. & G., 486. From the *Maryland case, supra*, he quotes: "It has also been said that such a contract is enforced against the party *non compos mentis*, not so much upon the idea

that it possesses the legal essential of consent, but rather because, by means of an apparent contract, he has secured an advantage or benefit, which cannot be restored to the other party, and therefore it would be inequitable to permit him, or those in privity with him, to repudiate it"—citing *Bank v. Sneed,* 97 Tenn., 120, 36 S. W., 716, 34 L. R. A., 274, 56 Am. St. Rep., 788; *Lincoln v. Buckmaster,* 32 Vt., 652; *Matthiessen & Weichers Refining Co. v. McMahon's Adm'r,* 38 N. J. L., 536.

The Master adds: "The last case referred to has probably been cited, on this subject more than any other case in the American Courts. It and the *Sims v. McLure case* are cited in practically all of the leading authorities on this point."

The epitome of the findings and conclusion of the *Langley v. Cease case* is thus stated in the syllabus: "In order to set aside the solemn contract of an idiot or a weak-minded person, where such person received the benefits accruing from the contract, it must appear either that the parties can be restored to their former status or that the other party to the contract had notice, either actual or constructive, of the incapacity of the alleged feeble-minded person, so that a mortgage cannot be avoided by the heirs of the mortgagor merely on proof that she was feeble-minded, without proving notice of that fact to the mortgagee at the time he paid the money to the mortgagor."

It has been judicially decided in this case that there is no fraud in it. His Honor charged the jury to that effect, as shown herein, and also that there is no proof that the insurance company had any actual notice of any kind of the alleged insanity of the deceased, B. B. Williams, when he was paid the $1,606.00.

On the subject of notice the Court charged the jury: "Every person is supposed to be sane and (one?) is not put on notice of insanity unless actual notice be brought home to a person who is contracting with an insane person."

This charge conflicts with that in which his Honor instructed the jury "that if a person is adjudged insane and

committed to the asylum by a Probate Court * * * that would be notice to a person dealing with him while he was in the asylum of the fact that he was committed to the asylum."

Again, we say that charge might have been correct if the person dealing with the insane person had knowledge that he was in the asylum. Here, there was not one word of evidence to prove that the insurance company knew, when the contract was made, that B. B. Williams, Sr., was in the asylum. On the contrary, the evidence shows that it did not know.

We think the motion for directed verdict should have been granted.

The motion for new trial was made on the grounds hereinabove set out. We have practically discussed the issues made by the first two grounds of the motion for new trial and need not repeat that argument. We think the grounds of those items of the motion are well taken, and that the motion should have been granted on the strength of them.

We think also that there is merit in the grounds stated in the third item of the motion.

When the policy which insured B. B. Williams, Sr., lapsed for the nonpayment of premiums, the insured had two options. He could accept it as a paid-up policy for $2,375.00 payable at his death; or he could take in cash its cash value, viz., $1,606.00. He elected the last option and was paid $1,606.00, and surrendered his policy and signed a release of any other interests in, or claims growing out of the policy. No part of this sum of $1,606.00 has been repaid to the insurance company, nor has any tender to repay it been made. Within a few days of six years after the death of the insured an action is brought to collect of the insurance company the amount of the paid-up policy, with interest thereon from the death of the insured.

One wonders why this long delay?

It will not be denied that plaintiff is not entitled to collect both the amount of the cash surrender value, $1,606.00, and the paid-up policy, $2,375.00. Yet

that is what the jury has attempted to give the plaintiff. There is but one logical inference deducible from the amount stated in the verdict, viz., that the jury was convinced that the surrender of the policy, the payment of its surrender value, $1,606.00, and the signing and delivery of the release, were in pursuance of a fair and *bona fide* contract, in which there was no fraud, nor imposition, nor undue influence, made without knowledge on the part of the insurance company that B. B. Williams, Sr., was insane.

Believing this, and knowing that this money had not been returned, they undertook to remedy this wrong. This they undertook to do by subtracting it from the amount of the paid-up policy. But they could not do this. If the $1,606-.00 was rightfully paid to the insured, he had no further interest in the policy, and was not entitled to any part of the paid-up policy value. Yet the verdict permits the plaintiff and those for whom he sues to retain the $1,606.00, which they have had for ten years, and gives in addition thereto the sum of $1,199.64 of the amount claimed on the extended insurance policy.

It is an illogical and irreconcilable verdict, and cannot stand.

The judgment below is reversed and the case remanded, with direction to enter judgment for the defendant.

Mr. Chief Justice Stabler and Messrs. Justices Baker and Fishburne concur.

Mr. Justice Carter did not participate on account of illness.