EDWARD  D.  McCONKEY  *vs.*  WILLIAM  WARFIELD
COCKEY.

*Guardian and Ward—Settlement—Burden of Proof—Release—Fraud—Laches.*

Courts of equity will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased, and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the term, the fullest deliberation on the part of the ward, and the most abundant good faith—*uberrima fides*—on the part of the guardian.

Where the transaction occurs within a short time after the ward attains his majority, the *onus* of proof is on the guardian to show everything requisite to make the settlement valid and binding.

A guardian in settlement of a balance shown to be due his ward, transferred to him, fourteen days after he attained his majority, certain shares of stock in a purely speculative manufacturing company, with emphatic assurances that it was an excellent investment, and would pay very handsome dividends, and by such representations and through his power over, and his influence with, him, induced him to execute a release acknowledging the receipt of said balance. These representations of the guardian proved to be untrue. The stock turned out to be utterly valueless. On a bill in equity by the ward upon the discovery that he had been imposed upon and deliberately defrauded by his guardian, it was HELD:

1st. That the release executed by the ward should be vacated and set aside, and that the guardian should pay over the money for which he was accountable to his ward on reaching his majority.

2nd. That the ward was not guilty of laches in not filing his bill of complaint until two years after the execution of the release, the same having been filed promptly upon his learning of the fraud that had been practised upon him.

APPEAL from the Circuit Court of Baltimore City.

McConkey *vs.* Cockey.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, BRYAN, and McSHERRY, J.

*John H. Thomas,* for the appellant.

*Thomas S. Baer,* and *John Prentiss Poe,* for the appellee.

McSHERRY, J., delivered the opinion of the Court.

In the month of February, eighteen hundred and seventy-three, the appellant duly bonded as the guardian of the appellee. At that time the latter was but thirteen years of age, without father or mother, the one having died in eighteen hundred and sixty-seven and the other five years thereafter. McConkey, who was the husband of Cockey's eldest sister, was appointed executor of the will of Mrs. Cockey, and in that capacity stated an account in the Orphans' Court of Baltimore County showing the balance due to the appellee by Mrs. Cockey, the former guardian. The subsequent settlement of her estate by McConkey placed in his hands, as guardian, nearly seven thousand dollars additional. The appellee after the death of his mother resided with the appellant, and, with the exception of brief intervals, continued to reside there until after his majority. No guardian accounts seem to have been stated in the Orphans' Court until some months after the settlement made by McConkey with Cockey upon the latter attaining his majority, which occurred on the seventeenth day of October eighteen hundred and eighty. On the first day of the following month McConkey made up a statement of his accounts showing an apparent balance of ten thousand five hundred and ninety-one dollars and thirty cents due to

his ward. From that balance several sums were to be deducted, leaving seven thousand seven hundred and seven dollars and ninety-seven cents as the true amount due. In settlement of that sum McConkey transferred and delivered to Cockey on said first day of November, three certificates for one hundred and fifty shares of the capital stock of the American Manufacturing Company, of the nominal value of fifteen thousand dollars; and on the twenty-seventh of the same month Cockey executed a release to his guardian acknowledging the receipt of the said ten thousand five hundred and ninety-one dollars and thirty cents. Cockey subsequently discovered that this stock was valueless and thereupon filed a bill in the Circuit Court of Baltimore City against the appellant, who was then and still is living in New York; charging that said release had been obtained by fraud and praying that it might be vacated and that McConkey be decreed to pay the sum of seven thousand seven hundred and seven dollars and ninety-seven cents, with interest. McConkey answered the bill and denied its material averments. The Circuit Court passed a decree granting the relief sought. From that decree this appeal has been taken.

There is no room to question or to controvert, at this day, the well settled and salutary principles which govern Courts of equity in dealing with a case like this. "They will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased, and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the term, the fullest deliberation on the part of the ward, and the most abundant good faith, (*uberrima fides*) on the part of the guardian." 1 *Story Eq.*, sec. 317. Where the transaction

McConkey *vs.* Cockey.

occurs within a short time after the ward attains his majority, the *onus* of proof is on the guardian to show every thing requisite to make the settlement valid and binding. *Smith vs. Davis,* 49 *Md.,* 489. When, therefore, the appellee attained his majority it became the obvious duty of the appellant to turn over to him all property belonging to the ward in the possession of the guardian, including the sum of money heretofore mentioned. His plain obligation was to pay that sum of money in cash. Instead of doing this he transferred to him, whilst the ward was still living under his roof, as a member of his family, and in just fourteen days after Cockey reached his majority, these one hundred and fifty shares of stock with emphatic assurances that the stock was an excellent investment for which he had been recently offered sixty dollars a share; that it was better than gas stock, because that had been repeatedly watered; more profitable than city stock, because that paid a low rate of interest, and safer than railroad securities because they were dangerous, and that it would pay very handsome dividends. The appellee knew nothing whatever about the stock or the company by which it had been issued. He relied wholly and confidingly upon the representations of his guardian under whose dominion and control he had lived since childhood. McConkey had been but shortly prior to that time the manager or superintendent of the company, and, of course, knew its condition, the value of its stock and the extent of its business. The appellee was informed by his guardian that the latter had become possessed of this stock because of its having been pledged to him as collateral security for a loan made by him of the money of the appellee,—the borrower of that money having failed to pay the interest on it and the stock having been taken in consequence. Between the date of the transfer of this

stock and the date of the release, McConkey frequently repeated his representations touching the value of the investment and the large business carried on by the company in the manufacture and sale of oleomargarine. Under these circumstances, induced by these assurances given by one who had stood towards him, for so long a time, in the close and intimate relation of guardian, the appellee, without any investigation whatever, accepted this stock in the confident belief that his guardian's statements respecting it were absolutely true. It is abundantly established by the evidence that he relied implicitly upon these representations and that his acceptance of the stock was influenced exclusively thereby. These representations proved to be untrue. The stock turned out to be utterly valueless. The company had been organized but a few years before with a capital stock of two hundred and fifty thousand dollars, the whole of which was absorbed in the purchase of a privilege to use in Maryland and the District of Columbia the Mège patent (the validity of which was in dispute) for the manufacture of oleomargarine. The company had no working capital and its machinery was purchased with money borrowed on notes indorsed by the directors. These notes were paid out of its subsequent earnings and the balance of those earnings was used to conduct and carry on the business. Its operations during some of the winter months showed profits. Several of the former directors testified that they regarded its stock in eighteen hundred and eighty as valuable, and as likely to yield profitable results. The witness who was the most pronounced in the expression of these views, held at the time the company was formed, or acquired shortly thereafter, one thousand shares of its stock; but notwithstanding his enthusiastic opinions regarding its value, he gradually disposed of the greater part of his holding, until, at

the time of the final dissolution of the concern, he was the owner of but one hundred and thirteen shares. Another of these witnesses by becoming a shareholder secured the position of superintendent of the factory at a salary of two thousand dollars a year; and the firm of which he was a member was made the sole agent for the sale, upon commission, of the company's products. Whatever may have been the opinions of those thus engaged in the enterprise, and however those opinions may have been influenced by self-interest, the fact, nevertheless, is, that early in eighteen hundred and eighty-three the plant, assets and entire estate of the company were sold under the hammer for six thousand five hundred dollars.

It is further shown by the evidence that McConkey did not receive the offer of sixty dollars a share for said stock, as represented by him; but, that on the contrary, shortly before he assigned it to his ward he had made unsuccessful efforts to sell it at as low a figure as thirty dollars per share. The books of the company disclose the fact that his statements to his ward as to the reason for and the manner of his having originally acquired the stock, were equally untrue; and that the actual fact was that he purchased these shares of stock from the very witness to whom allusion has been made as the holder of one thousand shares. The appellant knew that the company had never paid a dividend. He not only had no authority to purchase this stock, but he procured it in open disregard of an order of the Orphans' Court directing him to invest the money quite differently. It may have been, and most probably was done to enable himself to become the company's business manager. It is not shown how much he paid for this stock, and although his good faith and his integrity were both assailed by the bill of complaint and most directly involved in this

case, he failed to appear as a witness either to contradict the testimony impeaching this transaction with his ward, or to explain, if he could, its damaging import. His silence under such circumstances is strongly indicative of the truth of the imputations made against him.

He had misappropriated his ward's money, and when the time came for him to settle, he was without the means to do it. Discovery was imminent and there was danger of his bond being put in suit. In this dilemma he used his position, his power over, his influence with, and the hold he had upon the confidence of, this inexperienced youth to force upon him this worthless stock of a purely speculative concern; and to exact a formal release to himself from all accountability whatever. So far from this conduct exhibiting that rigid and signal good faith demanded in such cases, it furnishes strong and convincing evidence of the most reprehensible fraud. He has made no effort to show that the settlement with his ward was fair, or that it was honestly made. Surely a Court of equity cannot permit such a transaction, so ruinous and so unfair and unjust, to be sustained.

The bill was filed exactly two years after the execution of the release. This delay has been relied on as a bar to the right of the appellee to relief. Laches is relative. It depends on the facts of each case. *Canton, et al. vs. McGraw,* 67 *Md.,* 591. For some considerable time after the execution of the release, McConkey continued to lull the appellee into the belief that the stock was valuable; and it was not until late in eighteen hundred and eighty-two, after the return of the appellee to Baltimore from West Virginia, that he took steps to investigate the matter. During his stay in West Virginia Cockey was led, by the letters of McConkey, to still credit the latter's representations. The bill

was filed promptly upon the discovery, by the appellee, that he had been imposed upon and deliberately defrauded by the appellant. There was no unreasonable delay whatever. The decree appealed from being, in our opinion, entirely free from error will be affirmed with costs.

