## OVERHOLT v. MATTHEWS.

---

LACHES; FIDUCIARY RELATION; GOOD FAITH; BURDEN OF PROOF; RIGHT
                    TO ACCOUNTING.

1. A suit for fraud, seasonably instituted, will not be dismissed because of a delay of ten years in its prosecution, where none of the parties thereto were in any way prejudiced by the delay, and the applicant for the dismissal was as much responsible as the complainant for the delay, and during the delay acquiesced in an order enlarging the time for a step in the proceedings. (Citing *Meloy* v. *Keenan*, 17 App. D. C. 235.) (The CHIEF JUSTICE dissenting.)

2. Where an inventor makes an agreement with an attorney to procure a purchaser for his invention or to organize a company for its exploitation, and the attorney takes charge of the situation, reducing the agreement to writing and characterizing himself therein as the inventor's attorney, and their correspondence shows that fiduciary relations exist between them, the burden is upon the attorney

to prove good faith toward the inventor and that he kept him informed of all facts material to his interest, if it appears that the attorney has reaped a special benefit from the relationship. (The CHIEF JUSTICE dissenting.)

3. A court of equity has jurisdiction to compel an accounting where fiduciary relations exist between the parties or a discovery is sought.

No. 3170.   Submitted January 9, 1919.   Decided March 31, 1919.

HEARING on an appeal from a decree in the Supreme Court of the District of Columbia, dismissing a bill for discovery, accounting, and general relief.                                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This appeal is from a decree in the supreme court of the District dismissing appellant's (Edwin E. Overholt) bill for discovery, accounting, and general relief.

The original bill was filed on April 30, 1906.   Process was served on William B. Matthews, since deceased.   On June 4, 1906, Matthews filed a general demurrer to the bill.   The demurrer shortly thereafter was taken under advisement by the court and finally sustained in November of 1908, with leave to amend.   On January 4, 1909, the amended bill was filed.   To this amended bill Matthews again interposed a demurrer, alleging that the complainant had been guilty of laches.   This demurrer was overruled in May of 1909, with leave to Matthews to answer over.   His answer was filed in June of 1909, to which complainant interposed a replication.   An order of publication against Tyng and Stringfield was passed in August of 1906 and proof of publication filed October 25, 1909, when a decree *pro confesso* was entered against each of them.   On the same day (October 25, 1909), process was served on the defendant Overholt Railway Signal Company through Joseph D. Wright, secretary, and a director of said company.   On November 15, following, complainant filed a motion to enlarge the time for taking testimony.   This motion was granted on November 28th,

following, *the defendant Matthews, through his attorney, consenting thereto.* No effort appears to have been made by either side to bring the cause to a hearing prior to the death of Matthews in September of 1914. Subsequently his death was suggested, and in March of 1916 Alice T. Matthews, as executrix, filed a motion to dismiss for want of prosecution. This motion was overruled and the cause finally came on for hearing, no appearance having been entered on behalf of any of the other defendants.

The averments of the bill deemed material to this opinion are substantially as follows: The complainant, Overholt, having invented and, under date of March 22, 1901, applied for a patent on a "safety device for the display of train order signals," on March 28, 1901, entered into a written contract with Matthews, a practising attorney of this city. This contract was prepared by Matthews and recites that Overholt has invented and applied for a patent on the safety device and that he "is desirous of either disposing of the same outright or to establish a company for the purpose of manufacturing, selling, and leasing the same, and to this end desires the services of the said Matthews *as his attorney.*" The contract provides that Overholt is to furnish the invention and exhibit it whenever necessary; that Matthews "is either to procure a purchaser or purchasers for the same, or to organize a company for the proper handling of the same," Overholt to give Matthews for his services a one-third interest in the invention "or in the results obtained from the sale and distribution of the same, and, in the event of the organization of a corporation and the issuance of stock based upon the invention, said Matthews is to receive for himself one-third of the stock in full satisfaction for his said services." It is further provided that neither is to take any steps without consulting the other, and that Overholt is to furnish no money.

In April of 1901 Overholt met Tyng and Stringfield through Matthews, who vouched for their character and standing. The device was exhibited to these men, and finally, on the 2d of May, 1901, the earlier agreement with Overholt was superseded by an agreement between Overholt, Tyng and Matthews.

This agreement contains the preliminary recitals of the prior agreement and, in addition, recites that the time has come for the formation of a company "for the sale and handling of said invention." After providing for the annulment of the prior contract and reciting that it is the desire of Matthews and Overholt to associate Tyng in the enterprise, the contract provides that "for and in consideration of past services as well as the services to be hereafter rendered the said Overholt by the said Matthews, and the services to be hereafter rendered by the said Tyng in the formation of a company for the proper disposal of the device of the said Overholt, that said Matthews and Tyng shall be the *sole attorneys and agents* of the said Overholt in the disposal of said device when patented, in such manner as to them may seem most advantageous." Overholt then binds himself, in the event of the formation of a company, to convey the patent when issued to the company and to turn over to Matthews and Tyng one third of the capital stock of such company "for their services to be and already rendered under this agreement." Overholt further agrees to turn over to Matthews and Tyng, in addition to the one third, enough stock to equal 49 per cent of the capital stock of the company, "this last-mentioned stock to be used for the expenses of organization in such manner as said Matthews and Tyng may decide is best and proper." On the same day the same parties entered into a further agreement in which Overholt gave Matthews and Tyng "the exclusive option on the purchase of his remaining interest in said invention and patent as represented by stock issued to said Overholt for six months after transfer of patent by Overholt to a company to be formed for the handling of said patent by the said Matthews and Tyng, for the sum of $9,000." Matthews and Tyng, in a separate agreement made on the same day, agreed to divide equally all stock issued to them and to "make no charge to the company for services *until such time as company is well established and said charges are approved by the board of directors.*"

It is averred in the bill that shortly before the institution of this suit complainant discovered that the individual defendants,

or some of them, prior to or about the time of the consummation of the above option contract, had found purchasers for 90 shares of the stock of the company to be formed, for which $9,000 was to be paid; that this amount was "practically in sight of said defendants and ready to be turned over to the defendants with which to pay unto the complainant the purchase money so offered, promptly upon the organization of the company."

In May of 1901 the Overholt Railway Signal Company was incorporated in West Virginia. The first stockholders' meeting was held in Chicago the day following. Matthews, Tyng, and Stringfield, with others, were elected directors, and shortly thereafter Tyng was elected secretary. On May 25, 1901, Overholt executed an assignment of his pending application to the company, receiving therefor 980 of the 1,000 shares of the capital stock of the company, the par value being $100 per share. A certificate for 510 of these shares was indorsed in blank and turned over to Matthews and Tyng for delivery when the purchase price of $9,000 should be paid. There was also indorsed in blank and delivered to Matthews, Tyng, and Stringfield, a certificate for the remaining 470 shares. The bill alleges that promptly upon the organization of the corporation 90 shares of the stock were sold for $9,000, but that this fact was concealed from the complainant, and the money divided among Matthews, Tyng, and Stringfield. Thereafter, on October 1, 1901, Letters Patent No. 683,861 were issued on complainant's application and, being ignorant of the foregoing facts, complainant assigned the patent to the corporation, together with a patent issued by the Canadian government. Finally complainant changed the place of business of the company to Washington. The final allegation of the bill is that Matthews and Tyng did not act in good faith toward the complainant, but, on the contrary, induced him to consent to the formation of a company and thereafter took advantage of him, and, with Stringfield, appropriated to their own purposes the proceeds of the sale of shares of stock of the company held by them or by the corporation.

In the answer of Matthews he "denies concealing anything from the complainant, which it was his duty to make known to him." He admits receiving from Tyng and Stringfield at different times "sums aggregating over $1,000," but alleges that these sums represented the proceeds of the sale of stock belonging to Matthews, and "suggests that the books of the company, particularly the stock book, will show when and to whom and for what amount this stock was sold."

At the hearing it appeared that the complainant is a retired minister of the Gospel. During all the time involved he has been in delicate health and is "a man of very modest and retiring disposition." It is apparent from the evidence that he trusted Mr. Matthews implicitly and that he was dominated by him. On May 6, 1901, Mr. Matthews wrote him as follows, "This letter will be handed you by Mr. Tyng. Be careful not to talk business with him or anyone else. All I want you to do is to demonstrate the utility of your invention to those to whom he may take you." On May 21, following, in another letter to Mr. Overholt, Mr. Matthews said: "I will get you the $9,000 out of the patent." Subsequent correspondence between Matthews and Overholt shows the closest relationship between them. Finally, early in 1903, and while Overholt was in the dark as to the sale of stock, Matthews wrote him discouragingly that Tyng had written him, Matthews, "that if they can get hold of all the stock, including yours and mine, they would take it, and they make us the generous offer of $500 for the whole concern. I wrote him at once that I would not even make the proposition to you, but that he might have mine, $4,500 for $100." In conclusion the letter stated: "I do not believe that anything will ever be made of the company and if you want my stock, you may have it for just what I offered it to these people for, and you may also have the refusal."

There was introduced in evidence a volume marked "Secretary's Record and Stock Account." This volume contained the first annual report of the treasurer, dated May 15, 1902, which showed cash received in the sum of $9,000 and cash disbursed to the amount of $8,996.76, leaving a balance of $3.24.

*Mr. George H. Lamar,* for the appellant, in his brief cited:

*Adams Exp. Co.* v. *B. & W. Co.* 35 App. D. C. 213; *Baker* v. *Humphreys,* 101 U. S. 494; *Brooks* v. *Martin,* 2 Wall. 70; *Burton* v. *Drigges,* 20 Wall. 125, 134; 5 Century Dig., Attorney & Client, § 248; *Ches. Bch. R. Co.* v. *Brez,* 39 App. D. C. 71; 4 Cyc. pp. 960–962; 8 Cyc. p. 410; 10 Cyc. 614; D. C. Code, § 105; *Hodges* v. *Planters' Bank,* 7 Gill. & J. 306; *Lowe* v. *Boteler,* 4 Harr. & McH. 346; *Maloy* v. *Keenan,* 17 App. D. C. 235; *McKerkey* v. *Cockey,* 69 Md. 286; *Merryman* v. *Enter,* 59 Md. 588; Morawetz, Corp. § 237; *National Bank* v. *Lake Shore, etc.* 21 Ohio St. 232; *Robinson* v. *Ellis,* 35 L.R.A. (N.S.) 983; 1 R. C. L. 484, 485; 1 R. C. L. 518; 10 R. C. L. § 369, p. 1170; *Scott* v. *Herrell,* 31 App. D. C. 45; *Smith* v. *Davis,* 49 Md. 470; *Standard Oil Co.* v. *Doyle,* 111 Am. St. Rep. 340; *Stewart* v. *Fireman's Ins. Co.* 53 Md. 562; Story, Eq. Jur. § 310.

*Mr. Chas. A. Keigwin,* for the appellee:

The trial court dismissed the bill mainly because of the plaintiff's laches in prosecution. The case of the appellee might perhaps be safely rested upon that ground and upon the very able opinion of Mr. Justice Siddons. Additional considerations conducing to the same result are, however, here submitted.

I. The bill is demurrable as stating no fraud or other delinquency on the part of the defendants.

II. The single fact alleged in the bill as affording even colorable ground for an imputation of fraud against the defendants is the fact that Matthews, Tyng, and Stringfield sold certain shares of the corporate stock which had been set over to them as their compensation for services rendered in the promotion of the company. The gravamen of the plaintiff's complaint is that the shares sold were impressed with a trust in his favor, and that the defendants ought to have paid to him the proceeds of the sale, but did not do so.

III. The supposed trust was concededly not created by any express agreement, nor does it result from any misrepresentation or other fraud.

The bill does not pretend that the defendants or any of them ever promised to hold the stock set over to them in trust for Overholt. Nor is there the slightest attempt to prove any such promise, and the whole suggestion of a trust is denied in the answer of Matthews.

Neither is it anywhere intimated that any of the defendants ever made any misrepresentation or other statement from which an agreement to hold their stock in trust could be inferred or from which a trust might result.

IV. One fact is alleged as accounting for the fantastic conception of an option which the plaintiff imputes to himself.

The option agreement was made on May 2, 1901. From divers documents purporting to be records of the Overholt company and offered in evidence by the plaintiff, it appears that some of the stock assigned to the defendants was sold on June 1, some on June 27, and some on June 28, the shares being altogether 90 in number and selling for $9,000. These alleged records were delivered to Overholt in 1903, and were in the possession of his counsel when the bill was drawn.

V. The alleged trust did not arise from the relationship to each other in which the parties stood.

The proposition is that it was the legally binding duty of the defendants to appropriate the first money which they might receive from the sale of their own stock to the purchase of the defendant's. Since there was confessedly no promise to that effect, this duty must be deduced from the nature of the transaction and the relationship of the parties to each other.

VI. The alleged fact that the defendants, in taking the option from Overholt, knew they could sell their own stock, is not proved.

The single averment, as has been pointed out, which affords any color for an imputation of delinquency against the defendants is that they had $9,000 practically in sight when they took the Overholt option.

This averment is positively denied by Matthews in his an·
swer.

VII. There is no evidence to sustain any of the material
averments of the bill.

The oral testimony adduced by the plaintiff does not touch
any material element of the case or any fact in issue. The cor-
respondence between Matthews and Overholt shows that Mat-
thews was very active and zealous in endeavoring to establish
Overholt's invention for more than a year, and until its failure
was demonstrated.

Overholt took the stand in his own behalf, but contented
himself with identifying certain documents as being those
which the defaulting defendants had delivered to him, and
which they said were records of the company.

Upon the material facts of the case there is actually not a
syllable of oral testimony, and the only evidence is the answer,
the letters of Matthews, and the documents.

Mr. Justice ROBB delivered the opinion of the Court:

The learned trial justice, in his opinion, attached consider-
able importance to the delay of complainant in the prosecution
of his case and it is clear that this view was largely responsible
for the conclusion reached. That the suit was seasonably
brought there can be no serious question, and while the com-
plainant did not testify, as he might have done, in support of
the averments in paragraphs 8 and 13 of his bill to the effect
that he did not learn of the sale of the stock by defendants
until shortly before the institution of his suit, it is not alleged
in the answer that he ever was given this information by the
defendants or anyone else. Moreover, the discouraging letter
of the defendant Matthews under date of January 31, 1903,
clearly indicates that complainant had not then been informed
of what actually had taken place and that it then was the policy
of the defendants to suppress the facts. It fairly appears,
therefore, that there was no undue delay in the institution of
this suit. Certain it is that none of the parties, so far as the

record shows, was in anyway prejudiced by the delay, if delay there was. Having instituted the suit within a reasonable time, the complainant may not be prejudiced because of a delay for which the defendant Matthews was as much responsible as was he. *Meloy* v. *Keenan,* 17 App. D. C. 235. It there was said: "The defendant had it in his power to prevent unnecessary or unusual delay. By the use of ordinary diligence he could have forced the case to call for trial and its dismissal upon default of the plaintiff. Having been as indifferent as the plaintiff in respect of further proceedings he is in no situation to complain of his neglect." As late as November of 1909 the defendant acquiesced in an order enlarging the time for the taking of testimony, and there is nothing in the record to indicate that he thereafter made the slightest effort to bring the case to trial. Indeed, it is not a violent assumption that he was quite content with the situation. If his lips now are sealed, so, too, are those of complainant, at least as to relations between the two.

Coming now to the merits, complainant's case substantially amounts to this: He invented a train signal device, applied for a patent thereon, and subsequently became acquainted with Mr. Matthews, an attorney and evidently a forceful and energetic man. Mr. Matthews took charge of the situation, reducing the agreement between the two to writing and characterizing himself therein as Overholt's attorney. Matthews, who was either to procure a purchaser for the invention or to organize a company for its exploitation, then interested Tyng and Stringfield, and a new contract was entered into in which Matthews and Tyng were made *"sole attorneys and agents"* of Overholt. At the same time Matthews and Tyng, in a separate agreement, were given an option on the patent for six months from the date of transfer of the patent to a company to be formed. The company was formed for the exploitation of Overholt's device and the patent thereon was to be, and was, the only asset of the company when formed. The first annual report of the treasurer of the company shows the receipt of $9,000. This must have been from the sale of company stock. Matthews, in his

answer, admits receiving upward of $1,000 on account of stock sold, but says it was the proceeds of the sale of his own stock. The treasurer's report and the stock accounts in evidence, however, indicate the contrary. Obviously, the $9,000 received by the corporation represented the sale of corporate, and not individual, stock. Otherwise, it is reasonable to assume that the proceeds would not have found their way into the treasury.

Mr. Matthews not only characterized himself as Mr. Overholt's attorney and agent, but the contracts and correspondence between them clearly show that such was their real relationship. The correspondence further shows that Overholt relied upon Matthews, and had a right so to do, not only to represent him in good faith, but to keep him informed of all facts material to his interest. In such circumstances the burden is on the attorney to prove good faith if it appears, as it certainly does here, that he has reaped a special benefit from the relationship. *Jones* v. *Byrne,* 149 Fed. 457; *Ringen* v. *Ranes,* 263 Ill. 11, 104 N. E. 1023; *Dunn* v. *Record,* 63 Me. 17; *Palms* v. *Howard,* 129 Ky. 668, 112 S. W. 1110; *Manheim* v. *Woods,* 213 Mass. 537, 100 N. E. 747; *Porter* v. *Bergen,* 54 N. J. Eq. 405, 34 Atl. 1067; *McConkey* v. *Cockey,* 69 Md. 286, 14 Atl. 465; *Baker* v. *Humphrey,* 101 U. S. 494, 25 L. ed. 1065; 6 C. J. 686; 2 R. C. L. 966. In *Thomas* v. *Turner,* 87 Va. 1, 12 S. E. 149, the court, speaking of the duty of an attorney to his client, said: "All transactions between the parties to be upheld in a court of equity must be *oberrima fides,* and the onus is on the attorney to show, not only that no undue influence was used or advantage taken, but that he gave his client all the information and advice as against himself that was necessary to enable him to act understandingly."

It is a familiar rule that courts of equity have jurisdiction to compel an accounting where, as here, fiduciary relations exist or a discovery is sought. *Warren* v. *Holbrook,* 95 Mich. 185, 35 Am. St. Rep. 554, 54 N. W. 712; *Thomas* v. *Hartshorne,* 45 N. J. Eq. 215, 3 L.R.A. 381, 16 Atl. 916; *Goddin* v. *Bland,* 87 Va. 706, 24 Am. St. Rep. 678, 13 S. E. 145; *Beggs* v. *Edison Electric Illuminating Co.* 96 Ala. 295, 38 Am. St.

Rep. 94, 11 So. 381. And even where the main relief sought may not be granted, an accounting may be directed although not mentioned in the prayers for relief. *Miller* v. *Sterringer,* 66 W. Va. 169, 25 L.R.A.(N.S.) 596, 66 S. E. 228; *Swan* v. *Talbot,* 152 Cal. 142, 17 L.R.A.(N.S.) 1066, 94 Pac. 238.

The answer in the present case admits the receipt by Matthews of more than $1,000 from the sale of stock. The complainant received substantially nothing. $9,000 was put into the treasury from the sale of stock. There is no contention that complainant was informed of this, and yet he furnished the only asset of the corporation and was the owner of a majority of its stock. Certainly enough appears to entitle him to the accounting for which he prays. The testimony of Tyng and Stringfield, by deposition or otherwise, will be as available to the executrix of Matthews as to Overholt, and from that testimony it should appear what disposition was made of the $9,000.

The decree is reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

The CHIEF JUSTICE dissents.