## In Re CUFFE'S ESTATE.

### (No. 4,785.)

(Submitted April 15, 1922.  Decided May 24, 1922.)

[207 Pac. 640.]

*Guardian and Ward—Ratification of Guardian's Acts—Undue Influence — Presumptions — Burden of Proof — Failure of Guardian to Return Inventory — Penalty — Disallowance of Fees.*

Guardian and Ward—Settlement With Ward—Undue Influence and Fraud —Presumptions.

1. Courts look upon settlements made by guardians with wards recently coming of age, as well as transactions between them, with distrust, and from the confidential relation existing between them it will be presumed that the ward was acting under the influence of the guardian and such transactions held constructively fraudulent and set aside unless shown to have been the deliberate act of the ward with full knowledge.

Same—Removal of Presumption of Undue Influence—Burden of Proof— When Ratification to be Approved.

2. A guardian has the burden of removing the presumption of undue influence and fraud attaching to a ratification by the ward of his acts soon after reaching his majority, *i. e.,* he must show good faith on his part and that the ward had full knowledge of all the guardian's transactions, but upon such showing the ratification must be approved.

Same—Permission to Ward to Manage Estate—Effect.

3. Where a guardian permits his ward to manage his (the ward's) estate, any act of the ward while operating and managing it is in law the act of the guardian.

Same—Ratification by Ward of Guardian's Acts—Evidence—Sufficiency.

4. Evidence in a proceeding on the final account of the guardian *held* to show a ratification by the ward of the acts of the guardian, that in ratifying he was in no manner acting under the influence of the guardian, and that the ratification was such a one as is allowed by section 5888, Revised Codes of 1921.

Same—Failure of Guardian to Return Inventory—Penalty—Disallowance of Fees Proper.

5. Where a guardian fails to return into court inventories of the estate in his charge as provided by section 10422, Revised Codes of 1921, or render his account to the court for allowance as required by section 10423, the court may, in its discretion, disallow fees to his guardian and those paid or contracted to be paid by him to his counsel as penalty for such failure.

1. Settlement between guardian and ward out of court, see note in L. R. A. 1916E, 863.

*Appeal from District Court, Flathead County; T. A. Thompson, Judge.*

IN THE MATTER of the estate of John J. Cuffe, a minor. On hearing of the guardian's final account. From an order disallowing credits and refusing to allow guardian or attorney fees, the guardian appeals. Affirmed in part and reversed in part.

*Messrs. Logan & Child,* for Appellant, Henry Good, Guardian, submitted a brief; *Mr. E. M. Child* argued the cause orally.

*Mr. A. L. Hughes* and *Messrs. Brennen & Kendall,* for Respondent John J. Cuffe, submitted a brief; *Mr. W. J. Brennen* argued the cause orally.

HONORABLE ROY E. AYERS, District Judge, sitting in place of MR. JUSTICE REYNOLDS, disqualified, delivered the opinion of the court.

Matt Cuffe died intestate in February, 1917, leaving surviving him four children, all minors except Katherine Cuffe Gallegher, who was appointed administratrix of his estate, which was appraised at $36,000. John J. Cuffe, one of the minor children, had eighty acres of land in his own name, and under the law inherited one-fourth of his father's estate, all in Flathead county. Soon after his father's death and while yet a minor (he was born January 1, 1898), he went into business for himself—livestock and farming—bought cattle and farm machinery in excess of $5,500, all of which was done on credit. In fact, he became considerably involved financially, and on August 30, 1917, Katherine Cuffe Gallegher made her note as administratrix to the First National Bank of Whitefish for $3,500 to enable him to pay an account of $3,000 which he owed for cattle, the balance to be used for putting up hay and operating expenses. At the time his sister signed this note it was agreed between them that he would have a guardian ap-

pointed who should take up the note and release her from that obligation. Henry Good, the appellant, after several requests, finally consented to make application for letters of guardianship of the estate of John J. Cuffe, a minor, and finally, by nomination of the minor himself and at the request of his adult sister, Good was appointed such guardian, and duly qualified on December 3, 1917. Good never actually took possession of the estate over which he was made guardian. The boy had been married for some time and had been considered emancipated—had been dealing and contracting as freely, fully, and completely as if he had attained majority. The guardian permitted him to continue the management and operation of his estate the same as before, and it is not certain that his livestock enterprise would not have been successful had it not been for the "hard winter" conditions encountered.

Immediately upon qualifying as guardian, Good sought from the minor a statement of his indebtedness, receiving a report that it amounted to $929.35 on open accounts and $6,000 which had been reduced to promissory notes. This included the $3,500 note at the Whitefish Bank signed by the sister. However, it was soon learned that the open accounts amounted to $2,532.10 instead of $929.35, all of which was for necessaries of life and necessary operating expenses of the business of the minor, none of which were disputed; in fact, all had been contracted by him and was admitted by him. Good gave his note as guardian to the First National Bank of Whitefish for $3,662.75, taking up the sister's note with accrued interest, and gave his notes in like manner to the Conrad National Bank of Kalispell for $4,850 to take up other outstanding notes of the minor and to pay his open accounts.

During the guardianship, the minor bought a team of horses for $325 and attempts to repudiate the purchase for the reason that he bought them from the guardian. The evidence is in conflict on this point, but it is all to the effect that the minor needed the team; that the team was reasonably worth the amount paid therefor; that the guardian did not profit by the

63 Mont.—26

transaction; and that no prejudice resulted to the minor regardless of who sold him the team.

After the filing of the guardian's final account, Cuffe filed his objections against the allowance of the same upon the general theory that guardians cannot, by their contracts, bind the person or estate of their wards, and consequently the notes made and the obligations contracted by the guardian were recoverable only against the guardian personally, and that he should discharge the same and turn back and account to the ward for all the property owned by the ward at the time of his appointment. Good's defense to this contention, on the facts, was that no injury had resulted from his actions, and that a complete ratification of all his acts, deeds, and contracts as guardian had been made by Cuffe after his attaining the age of majority.

On the hearing of the guardian's final account, the court by its decree of October 23, 1919, found that the purported ratification did not meet the requirements of the law, and disregarded the same; disallowed him credit for the note at the Whitefish Bank, amounting at that time, together with interest, to the sum of $3,925.95; disallowed him credit for interest at the Conrad Bank in the sum of $145.59; disallowed him credit for the team in the sum of $325; and refused to allow him any guardian or attorney's fees. The guardian is appealing from the decree in so far as it disallowed these items.

John J. Cuffe became of age on the first day of January, 1919. Negotiations then commenced between him and the guardian for the settlement of his estate and the release of the guardian. On January 6 they met, together with the wife of Cuffe and E. L. Geddes, and the details of all the accounts were explained to Cuffe. However, they did not need explanation, for indeed he knew all about them. Good contends a settlement was made on that day between him and Cuffe, whereby Cuffe ratified all his acts as guardian. In fact, Cuffe and his wife executed a deed and bill of sale of all their real

estate and personal property to  him on that occasion, which he asserts were given as security until he be released from his trust as guardian and his bondsmen discharged, and which he holds only to that end.  That a settlement was reached on that occasion concerning everything except guardian and attorney's fees, and that the settlement included all the items disallowed by the court except guardian and attorney's fees, is manifest from the testimony.

Mrs. Cuffe testified: "I don't remember of John questioning any of these accounts or bills.  I understood, of course, that these deeds that were signed were for the purpose of enabling Mr. Good to pay off the debts that John had contracted, or that he had contracted for him.  I don't believe that John ever questioned these bills, or claimed that he didn't owe them, or anything of that kind.  *  *  *  There was no question raised at any time, as to these claims, by John."

Geddes testified: "Mr. Good had taken the matter up with Mr. Cuffe, and asked him about these accounts, and Mr. Cuffe said that he wanted to secure him in transferring property, that the debts that he had paid for and were contracted for were just and correct at that time; and they talked along a while, and deeds were suggested, given as security.  *  *  *  I never had any other conversation with him [Cuffe] other than the one about ten or twelve days later, when he came back and said things were all right—not a word; the thing seemed to have been closed at the time the deeds were given.  He went over—and so did his wife—that the debt was one that had been contracted and were just, and he wanted to secure Mr. Good at this time, and he was over age and wanted to enter into the transaction.  Mr. Cuffe and also his wife said they wanted to secure Mr. Good.  They were talking back and forth.  *  *  *  John did not at that time or at any other time make any objection to any items.  It seems like it simply settled it at that time, and that is all there was to it."

Good testified: "Shortly after John became of age, I went to Whitefish, and talked the matter over with him, and explained

[63 Mont. 399.]

to him the status of his affairs as nearly as possible, and also talked to John's wife. We went over to the house and explained things as near as I could, and I asked him—John was of age—if he knew of any way we could take care of this account, that is, any way to take care of those claims, *etc.*, and talked over the matter carefully and very extensively with Mrs. Cuffe and John, and they said no, that if I could take care of it until such time that they could sell some of the real estate or take care of it, that was the only solution they knew of; and I told them it was a large amount, and to secure myself and bondsmen, if everything was satisfactory and they thought I had done the best I could with it, I would like to have a ratification of the transaction, and they give me a deed to the property. I gave them a contract back, and then in Mr. Geddes' office I explained the matter to Mr. Geddes, Mr. Cuffe, and Mrs. Cuffe, and told Mr. Geddes to impress upon his mind in which way we took those deeds, and as soon as the court would release me as guardian and release me from those bills and responsibilities that the property would be deeded back to them at once. I don't claim the property except in that way. * * *

"Q. Did you strike a balance of indebtedness, agree on the approximate amount of indebtedness there; this stuff that had been bought? A. I went over every item with the exception of overpayment, which I didn't know at that time. Mr. Dickey found it later. I told him the amount of the outstanding bills and the different notes and the check-books, what stubs were written out, *etc.*, and this difference in the Gallegher account,—had him charged twice—I didn't know at that time—and this overpayment I didn't know until Mr. Dickey checked that up. (This was later corrected.) Q. Any particular reference to the note to the Whitefish Bank? A. Yes, sir. * * * John made no objection to any of these bills or claims, he said he wanted to pay every man every dollar that he owed, and his wife made the same statement; said they wanted to pay their bills first if it took it all."

Cuffe's own testimony discloses that he received a statement of account at the time of settlement, and even as late as the trial he did not dispute the correctness of the same or contend that any fraud or deceit had been practiced upon him; his only objection to the account, even then, was with reference to the indefiniteness of a meat item, which was not disallowed by the court, but approved. His objection to the settlement was an afterthought, as is evident by his objection, when on the witness-stand, to the settlement of the guardian's account, which was as follows: "My objections to the account are that I wasn't properly controlled. I was just a wild kid, and thought I was smart; and I didn't know what I was doing when I went into all these things and was handling the business I was in. I hadn't had any experience, and I was green, and everybody I dealt with seemed to be able to beat me. Then there was the beef account, I wasn't satisfied with; and the only full account I had ever seen of the beef was when the final account was filed here in court. Henry was never able to give me any account of all the beef—never able to get all the papers together so that I was able to know just exactly where I was at. I am blaming Henry, now, because he didn't properly control me, or take control of my business."

Many questions are involved in this appeal, but the determination of the case resolves itself to the ratification of January 6, 1919.

The formal objections to the settlement of the final account were made and prosecuted on the theory that the guardian could not by his contracts bind either the person or estate of his ward, and that such contracts bind the guardian personally, and recovery must be had against him. That point, however, is not involved in the case, for if the settlement made on January 6, after the ward reached his majority, was legal, it ratified all acts of the guardian. That a ratification of all the acts, contracts, and deeds of Good, as guardian, was made by Cuffe after he attained his majority is the only conclusion

we can reach; and now the question occurs: Was it such a ratification as is recognized in law?

Section 5888, Revised Codes of 1921, provides: "After ·the [1] ward has come to his majority, he may settle accounts with his guardian, and give him a release, which is valid if obtained fairly and without undue influence." Thus we see that such settlements and ratifications, if secured fairly and without un- due influence, are recognized by the statutes of this state. However, courts look upon settlements made by guardians with wards recently coming of age with distrust, and jealously watch the same, or any transaction between them affecting the estate of the ward. From the confidential relation between them it will be presumed that the ward was acting under the in- fluence of the guardian, and all transactions between them prejudicially affecting the interests of the ward will be held to be constructively fraudulent, and will be set aside unless shown to have been the deliberate act of the ward with full knowledge of his transaction. (*Meek* v. *Perry,* 36 Miss. 190; *Clark's Appeal,* 18 Pa. 175; *McConkey* v. *Cockey,* 69 Md. 286, 14 Atl. 465; *Ferguson* v. *Lowery,* 54 Ala. 510, 25 Am. Rep. 718; 21 Cyc. 169.) With this presumption we have no complaint, for it is our opinion that the jealousy of the courts and the general principle of public policy are to be directed to the protection of the ward in every respect, and that settlements, receipts, ratifications of guardians' acts and releases imme- diately after the ward's majority should be discouraged—not upon the theory that actual fraud is likely to be present in each case, but upon the broader ground that opportunity to commit fraud be minimized. Ordinarily, the relation of guard- ian and ward is next in order to that of parent and child, and the presumption (of undue influence) exists perhaps in the highest degree, and especially does that presumption exist if the dealing is the release of property by the ward to the guardian, and where there is an inadequacy of consideration the deal can rarely, if ever, stand. (*Wade* v. *Pulsifer,* 54 Vt. 45; *Garvin* v. *Williams,* 44 Mo. 465, 100 Am. Dec. 314; *McPar-*

*land* v. *Larkin,* 155 Ill. 84, 39 N. E. 609; *Bispham's Principles of Equity,* sec. 234, p. 337.)

It is neither desirable nor possible to define particularly what evidence will remove the unfavorable presumption indulged in by the courts against transactions between guardian and ward during the existence of the relation or soon after its termination. The guardian is an officer of the court, an agent of the law, and the law will not permit its agent to make a profit out of the trust which it has confided to his control. It exacts from him absolute fidelity, and will be satisfied with nothing less. Each case must depend upon the facts and circumstances attending it. In general, it may be said that the court must be satisfied that there is an absence of any influence springing out of the relation, and of any violation of the duty by the guardian—the act must proceed from the volition of the ward, and he must have full knowledge of its effect; then, and then only, will such transaction be approved. (*Rhodes* v. *Robie,* 9 App. D. C. 305; *Adams* v. *Reviere,* 59 Ga. 793; *Davis* v. *Hagler,* 40 Kan. 187, 19 Pac. 628; *Fielder* v. *Harbison,* 93 Ky. 482, 20 S. W. 508; *Dunsford* v. *Brown,* 19 S. C. 560; *Hawkin's Appeal,* 32 Pa. 263; *Norris* v. *Norris,* 85 App. Div. 113, 83 N. Y. Supp. 707; *Korn* v. *Becker's Executor,* 40 N. J. Eq. 408, 4 Atl. 434; *Holscher's Heirs* v. *Gehrig,* 127 Iowa, 369, 94 N. W. 486, 101 N. W. 759; *Gillett* v. *Wiley,* 126 Ill. 310, 9 Am. St. Rep. 587, 19 N. E. 287; 21 Cyc. 169. See, also, note, "Settlement after Ward Becomes of Age," L. R. A. 1916E, 864.)

The burden was upon Good to remove the presumption of [2] undue influence and of fraud attaching to the ratification; to show good faith on his part, and that Cuffe had full knowledge of all the transactions of his, as guardian. Upon a discharge of this burden the ratification must be approved. (Cases *supra,* and *Harrison* v. *Harrison,* 21 N. M. 372, L. R. A. 1916E, 854, 155 Pac. 356.)

Here, the usual confidential relation did not exist between [3] the guardian and ward; Good, in fact, was not the

guardian of the person of Cuffe, but only of his estate, which the ward himself was permitted to manage and operate. This the guardian should not have permitted, but under the circumstances, if he had placed another in physical charge, complaint could have been made that it was an unnecessary expense, and he, as all parties well knew, was a business man whose own affairs occupied all of his time, and who, therefore, was unable to assume actual charge himself; consequently his permitting the ward to continue in charge was excusable, but not commendable, and any act of the ward while managing and operating the estate was, in law, the act of the guardian.

The record discloses that in the settlement of January 6, [4] 1919, no advantage was taken of Cuffe; that he acted with full knowledge and appreciation of all conditions surrounding the settlement and the effect thereof, and that it was made of his own volition. Good gained no advantage over him, except to take security that he be released from his trust as guardian, which was freely given and its effect fully understood by Cuffe. It discloses further that Good will reconvey the security when so released; that no fraud was practiced; that no prejudice resulted to Cuffe; that he was not in any manner acting under the influence of Good when the ratification was made, and that Good acted in good faith. Therefore he discharged the burden cast upon him. The ratification was of such a nature as is recognized by law.

The court erred in disallowing credit to the guardian for the Whitefish Bank note in the sum of $3,925.95; the interest item at the Conrad Bank of $145.59, and the item for the team in the sum of $325.

As to the disallowance of the guardian and attorney's fees [5] the court committed no error. The guardian did not return to the court inventories of the estate, as provided by section 7774, Revised Codes of 1907 (sec. 10422, Rev. Codes 1921), nor did he render an account as provided by section 7775, Revised Codes of 1907 (sec. 10423, Rev. Codes 1921). We appreciate that the record here discloses that Good con-.

sidered himself, and was by all concerned considered, an "accommodation guardian," but such in law does not and cannot exist. A person assuming the legal status of guardian must comply with the requirements of the statutes or suffer the penalties incident to his failure thereof. The penalty of a forfeiture of fees to himself and those paid or contracted to be paid to his counsel is properly within the discretion of the court when a violation of the statutory duties of the trust occurs (sec. 7777, Rev. Codes 1907; sec. 10425, Rev. Codes 1921; *In re Allard Guardianship,* 49 Mont. 219, 225, 141 Pac. 661), and the court did not abuse its discretion in the disallowance of those items of the account.

The order appealed from, in so far as it disallows guardian and attorney's fees, is affirmed. As to all other items, it is reversed, and the cause is remanded to the district court, with directions to amend its decree settling the guardian's account, made October 23, 1919, so as to approve the guardian's final account, except as to guardian and attorney's fees.

ASSOCIATE JUSTICES COOPER, HOLLOWAY, and GALEN concur.

MR. CHIEF JUSTICE BRANTLY, being absent, takes no part in the foregoing decision.