Argued November 8, 1962, reargued March 4, affirmed September 5, petition for rehearing denied October 8, 1963

## OLSHEN *v.* KAUFMAN ET AL

385 P. 2d 161

*Paul R. Meyer,* Portland, argued the cause for appellant. On the brief were Kobin & Meyer.

*Carlton R. Reiter* and *Lewis B. Hampton,* Portland, argued the cause for respondents. On the brief were Reiter, Day & Anderson and Lewis B. Hampton.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

LUSK, J.

This is an action to recover the balance owing on a check for $5,750 given to the plaintiff by the defendant Leonard I. Kaufman, Jr. The other defendant, Leon W. Behrman, is the guardian of the estate of Leonard I. Kaufman, Jr., a spendthrift. When the action was commenced the only defendant was Kaufman; the guardian was not made a defendant until after the case came on for trial.

The question is whether, under the statute of this state providing for the appointment of guardians for spendthrifts, recovery may be had on the contract of a spendthrift when his guardian has repudiated the obligation.

The facts are free from dispute. Briefly stated, the record shows that in December, 1958, Kaufman induced the plaintiff, a druggist in Portland, to advance to him the sum of $1,575 as an investment in a joint venture for the purchase of toys for resale. A few months later Kaufman informed plaintiff that they had doubled their money. He offered to give plaintiff a check in settlement and at the same time proposed another venture in the purchase of binoculars to which the plaintiff agreed. Plaintiff's share of the toy business, his investment plus the profit, was $2,340. This sum and an additional $2,660, totaling $5,000, were thereupon advanced by plaintiff to Kaufman for use in the binocular business. Later Kaufman told plaintiff that the latter was entitled to $750 as his share of the profits from that venture, and he gave the plaintiff his check for $5,750, dated October 1, 1959, drawn on the Bank of California, N.A., in full settlement of his indebtedness to the plaintiff. There were insufficient funds in Kaufman's account with the

bank to pay the check and no part of the debt has been paid except $1,400. Plaintiff brought this action to recover the balance of $4,350, together with interest and a reasonable attorney's fee.

There was a trial before the court without a jury, upon the conclusion of which the court entered findings to the effect that the transactions, as a result of which Kaufman delivered the check to the plaintiff, were not transactions for necessaries and that the guardian had declared void the transactions and the agreement of Kaufman to pay $5,750 to the plaintiff. Judgment accordingly was entered for the defendant. The plaintiff appeals.

We think that the case was correctly decided.

ORS 126.005, in effect at the applicable times, provided:

> "As used in this chapter:
>
> "(1) 'Spendthrift' includes every person who, by excessive drinking, idleness, gaming or debauchery of any kind, shall spend or lessen his estate so as to expose or likely to expose himself or his family, to want or suffering, or to cause the county to be charged for the expense of the support of himself and his family."

The order adjudging Kaufman a spendthrift and appointing Mr. Behrman guardian of his estate was entered by the Circuit Court for Multnomah County, Probate Department, February 25, 1953, upon a petition filed by Kaufman's mother and sister, which showed, among other things, that Kaufman had a beneficial interest in a trust created by his grandmother from which he received an income of approximately $3,000 a year. Kaufman consented to the appointment in writing, as provided for by former ORS 126.135.

Behrman immediately duly qualified as guardian and has ever since acted in that capacity.

Former ORS 126.335, the statute in effect at the time of the transactions in question, provided:

"After the appointment of a guardian for a spendthrift, all contracts, except for necessaries, and all gifts, sales and transfers of real or personal estate made by such spendthrift thereafter and before the termination of the guardianship are voidable."

The statute originally provided that the contracts of a spendthrift are "null and void," OCLA 22-114. This was changed to "voidable" by Oregon Laws 1947, ch 524, § 17, and changed again in 1961 to "voidable by the guardian of the estate for the ward," Oregon Laws 1961, ch 344, § 37; ORS 126.280.

The statutes of other states regarding spendthrifts usually provide, as ours formerly did, that the contracts of a spendthrift while under guardianship, except those for necessaries, are null and void. We are of the opinion that the change from "null and void" to "voidable" in 1947 was made with the idea in mind that some contracts which a spendthrift might enter into would be for his benefit and that the guardian in such a case should be granted the discretion to determine that question and to avoid the contract if he thought that this would be in the interest of the ward, but if otherwise to affirm it. The 1961 amendment adding the words "by the guardian" after "voidable" was evidently adopted to clarify the meaning of the statute and to remove any doubts that might have arisen as to who was authorized to avoid the spendthrift's contracts. See *Elliott Grocer Co. v. Field's Pure Food Market, Inc.,* 286 Mich 112, 281 NW 557, 118 ALR 845. This right to avoid a contract was given

for the protection of the spendthrift. A similar right in the case of insane persons is ordinarily exercised by a guardian. Woerner, Guardianship, § 129; *Atwell v. Jenkins,* 163 Mass 362, 40 NE 178, 47 Am St Rep 463, 28 LRA 694; *Allen v. Berryhill,* 27 Iowa 534, 536, 1 Am Rep 309; *Carrier v. Sears,* 4 Allen (Mass) 336, 81 Am Dec 707. So, also, of infants. *Oliver v. Houdlet,* 13 Mass 237, 7 Am Dec 134. An Illinois statute provided that every contract with a "spendthrift made after the application for the appointment of a conservator, may be avoided, except in favor of the person fraudulently making the same." Rev. Statutes of Illinois, 1905, ch 86, § 15. In *Sheldon v. Eakle,* 160 Ill App 282, this right to avoid a contract was held to be in the conservator.

■ The purpose of the appointment of a guardian of the estate of a spendthrift is to protect the ward in his property against his wasteful and vicious habits which expose him or are likely to expose him or his family to want or suffering or to cause any public authority to be charged for any expense for his support or that of his family. ORS 126.005, supra. See *Norton v. Leonard,* 29 Mass 152, 161. It would seem to be fairly obvious that for the fulfillment of that purpose the responsibility of declaring void a contract entered into by the ward naturally devolves upon the guardian, along with his other duties. That this is what the legislature intended when it adopted the amendment in question we think there is no reason to doubt.

The guardian in this case having elected to declare the contract void, the plaintiff cannot recover upon it, unless there is merit in his contentions now to be considered.

By way of reply to the affirmative answer alleg-

ing the guardianship of Kaufman and the avoidance by the guardian of the contract sued upon, the plaintiff alleged that since 1957 Kaufman had regularly engaged in business as a wholesaler of toys, sporting goods, radios, and other merchandise; that defendant Behrman knew of Kaufman's business activities and made no inventory of the property of Kaufman used in them; that the contracts entered into by Kaufman in the pursuit of such business activities were the contracts of the guardian and that the defendants had waived any right to avoid the check which is the basis of plaintiff's claim, and are estopped to deny its validity.

The evidence is uncontradicted that Kaufman did engage in at least some of the business activities alleged. He maintained an office. He had commercial accounts in the Bank of California, N.A., and The United States National Bank of Portland and borrowed money from both banks. In June 1960 he borrowed $7,000 from the Bank of California, giving as collateral security a warehouse receipt for binoculars and 84 shares of stock of Trans Caribbean Airways, Inc., standing in his name. It is not necessary to go into these matters in further detail.

That Mr. Behrman knew about some of his ward's doings is not disputed. He testified that he learned of the bank accounts and instructed Kaufman not to maintain them and the banks not to allow them, and that he remonstrated with his ward regarding his engaging in business, but, in effect, that he could not control Kaufman.

Despite all this, it cannot be questioned that Kaufman had been duly adjudged a spendthrift and Behrman duly appointed his guardian and that the

guardianship was in existence at the time of the transactions which led to this lawsuit. This is not a case of a "dormant guardianship" referred to in *Reeves v. Hunter,* 185 Iowa 958, 967, 171 NW 567, where the ward is "restored to mental competency, and \* \* \* the guardian, recognizing such fact, surrenders to him his estate, and thereby becomes entitled to an order of discharge, but neglects to obtain the same," but a case "of an active, 'going' guardianship." Annual reports were regularly filed and their approval secured, and petitions presented and orders thereon taken relating to the routine business of the estate. The value of the estate as shown by the second supplemental inventory and appraisement filed March 11, 1958, was $63,410.17. The eighth annual account filed February 16, 1961, showed total assets valued at $86,381.38.

The question presented, therefore, is whether, if a spendthrift engages in business, to some extent with the knowledge, though not the approval, of his guardian, the ward and the guardian are estopped to question the validity of a contract entered into by the ward with one who has no actual notice or knowledge of the guardianship.

■ We are unable to see on what principle this can be held. A spendthrift under guardianship who enters into a contract impliedly, at least, represents that he is competent to do so; yet the mere fact that the party dealing with him has no actual knowledge of the guardianship will not prevent the spendthrift from relying on his incompetency as a defense when sued on the contract, *Reeves v. Hunter,* supra; *Sheldon v. Eakle,* supra; *Lynch v. Dodge,* 130 Mass 458. As stated in the case last cited:

"In order that the guardianship be of any practical value, it is essential that the ward be powerless

to make contracts which shall bind him or his estate, and the consequence of the appointment of a guardian of a spendthrift is that, from the time of the appointment, the ward ceases to be *sui juris,* except so far as contracts for necessaries are concerned, and is unable otherwise to deal with any part of his estate." 130 Mass at 459.

*In re Barker,* 83 Or 702, 164 P 382, is relied on by the plaintiff. In this case recovery was allowed for the agreed price and reasonable value of necessaries sold by the plaintiff to the ward for whom a guardian had been appointed as a spendthrift. It appeared that the guardian had placed in the hands of the ward each month ample funds for his sustenance, but that the ward squandered the money and failed to pay in full for the necessaries furnished him by the plaintiff, and the defendant argued that for this reason food furnished the ward by the plaintiff and consumed by the ward were not necessaries. The court said that it was a violation of the guardian's duty to commit the control of any considerable portion of the ward's property to the spendthrift himself, but that to declare that such conduct would take from the spendthrift's food its character as a necessary "would be to say that the payment of his just debts could be prevented by a void act." 83 Or at 706-7. The only principle established by this decision applicable to the present case is that dereliction of duty on the part of a guardian of a spendthrift cannot be invoked to affect the validity, or otherwise, of contracts entered into by the ward. Whether one contracting with the ward would have a remedy against the guardian in his personal capacity because of such dereliction of duty, is a question not presented by this record and concerning which we indicate no opinion. The guardian

is a proper party to defend the action in the interest of the ward, but he is not a proper party for the purpose of establishing a personal liability against him. *Sturgis v. Sturgis,* 51 Or 10, 19, 93 P 696, 131 Am St Rep 724, 15 LRA NS 1034.

Plaintiff quotes from 5 Bancroft's Probate Practice (2d ed) § 1345 as follows:

> "A guardian should not permit the ward to manage his own estate, and in case he does so, any act of the ward while so managing is in law the act of the guardian."

The foregoing statement is taken from *In re Cuffe's Estate,* 63 Mont 399, 207 P 640, which was a contest between a guardian and his ward, a minor, over the settlement of the guardian's accounts. The guardian had never taken possession of the property of the ward and the ward continued to operate a farm which he owned as he had before the guardianship. The court held that a complete and fair settlement of the accounts had been agreed upon by the parties after the ward became of age and added, obiter, the language quoted, which may have been appropriate to the facts of that case but can scarcely be accepted as a principle applicable to the dealings of the ward with third parties.

In *Reeves v. Hunter,* supra, the court said that the property of a spendthrift is "in a sense, *in custodia legis*" and that every person "dealing with one who is, in fact, under permanent guardianship, is bound by constructive notice of the judgment of disability," 185 Iowa at 964. *Sheldon v. Eakle, Lynch v. Dodge,* both supra, *Rannells v. Gerner,* 80 Mo 474, and *Imhoff v. Witmer's Administrator,* 31 Pa 243, 244-245, are to the same effect. The case of *Gen. Pulaski B. & L.*

*Assn. v. P. Tr. Co.,* 338 Pa 198, 12 A2d 336, which is cited as contra to these holdings, is explained and qualified in *Pa. Co. for Bank. and Tr. v. Phila. T. Ins. Co.,* 372 Pa 259, 262-264, 93 A2d 687. We think it is not in point. See, also, *Century Credit Co. v. Jones et al.,* 196 Pa Super 210, 213-214, 173 A2d 768. The fact that the defendant was engaged in business, if known to the plaintiff, might have misled the latter, but could not give validity to the spendthrift's contract. If he was incompetent to make a contract, he was equally incompetent to estop himself to assert its invalidity.

An analogy is suggested to cases in which some of the courts have held that infants may be estopped to avoid their contracts on the ground of incompetency. At common law an infant's contract is voidable by him upon his attaining his majority. In this state, where an infant has purchased an article of personal property as, for example, a motorcycle or an automobile, and on attaining his majority disaffirms the contract, returns the property and sues to recover the consideration paid by him, he will not be permitted to recover the amount actually paid without allowing the seller reasonable compensation for the use and depreciation of the article while in his hands. *Gaither v. Wallingford,* 101 Or 389, 200 P 910; *Petit v. Liston,* 97 Or 464, 191 P 660, 11 ALR 487. More nearly resembling this case are those in which an infant fraudulently misrepresents his age so as to induce another to enter into a contract with him. If the infant is sued at law upon such a contract it is held by all but a few courts that he is not estopped by his conduct to avoid the contract, 27 Am Jur 798, Infants § 67. See Annotations, 6 ALR 416, 418; 18 ALR 520; 90 ALR 1442. In other cases, according to the author of

the annotation in 6 ALR, "* * * it is not easy to say where [the weight of authority] is." Some of the courts have relied on the language of Lord Mansfield in *Zouch ex dem, Abbot v. Parsons* (1765), 3 Burr. 1794, 97 Eng Rep 1103, that the privilege "is given as a shield, and not as a sword" and "[t]here is considerable authority to the effect that one, having while an infant induced a contract by fraudulent representations that he was of full age, may not demand relief from a court of equity." 27 Am Jur 800, Infants § 70. See, for example, *Stallard v. Sutherland,* 131 Va 316, 108 SE 568, 18 ALR 516. On the other hand, it was held by the court of appeals of New York in *Sternlieb v. Normandie National Securities Corp.,* 263 NY 245, 188 NE 726, 90 ALR 1437, that in a suit to rescind a purchase of stock based on the ground that the plaintiff was under 21 years of age at the time he made the purchase, the defense that the plaintiff misrepresented his age was not valid. The court cited numerous authorities to support its statement "That the false representation regarding age does not prevent rescission, even when the infant be the plaintiff, is the holding of the courts in the majority of our States." 263 NY at 249. We need not pursue that matter further because we are not dealing here with that kind of a case.

■ Even though the analogy of the law regarding the contracts of infants were to be applied to spendthrifts, the plaintiff would not be aided, because, under the decided weight of authority, estoppel cannot be invoked against an infant when he is sued upon his contract and moreover in no case, so far as we are aware, has the infant been held estopped unless it appeared that at the time of entering into the contract he was of sufficient age to understand his rights and the

nature of the business on which he was engaged. See 27 Am Jur 798, Infants § 65. Thus in *LaRosa v. Nichols*, 92 NJL 375, 105 A 201, 6 ALR 412, the court said:

> "It seems anomalous, indeed, that youths *of sufficient age and capacity*, although less than twenty-one years old, may be convicted of crime, and be held liable for their torts, and yet not be liable on their contracts when apparently of sufficient capacity to make them, and when they procure their making by fraud." (Italics added.) 92 NJL at 379.

None of the cases in which the contracts of infants have been held enforceable on the ground of estoppel involve infants under guardianship. It cannot be assumed that a spendthrift under guardianship is of sufficient capacity to make a contract; that would be to attack the very basis of the court's order appointing a guardian for him. For the "guardianship [is] conclusive of the disability of the ward, whether in consequence of insanity, or habitual drunkenness, old age, sickness, or other cause whatever." Woerner, Guardianship 425. As the court said in *Lynch v. Dodge*, supra, 130 Mass at 458:

> "The fact being established that he has the characteristics which constitute a spendthrift, he is, in the interest of the public welfare, put in person and property into the same position with those who are incompetent, by reason of mental weakness, to manage their own affairs."

See, also, *Reeves v. Hunter*, supra, 185 Iowa at 961; *Hughes v. Jones et al*, 116 NY 67, 15 Am St Rep 386, 22 NE 446, 5 LRA 632; *Wadsworth v. Sharpsteen and Moffat*, 8 NY 388, 59 Am Dec 499; *L'Amoureux v. Crosby*, 2 Paige's Chancery Reports (NY) 422, 22 Am Dec 655; *Wait v. Maxwell*, 5 Pickering (Mass)

217, 16 Am Dec 391; *Hovey v. Hobson,* 53 Maine 451, 89 Am Dec 705.

Our attention is called to 1 Williston on Contracts (rev ed) § 254, where the author discusses the modern rule that if one dealing with a lunatic may reasonably suppose he is sane and makes a bargain with him on that assumption, mental incapacity is no defense to an action on a contract. The authorities to which Williston refers are all cases in which the lunatic was not under guardianship. This fact is specifically stated by the author in section 257, where it is said:

"In the discussion thus far it has been assumed that the lunatic was not under guardianship. When a guardian is appointed he thereupon becomes vested with the control of the property of his ward, and he alone is capable of transferring it. It may also be assumed that all contracts of a lunatic made during guardianship are held void. The guardian represents the lunatic for the purpose of all business transactions. * * *"

■ It is said by plaintiff that the provision of former ORS 126.320 (3), imposing on the guardian the duty to "pay out of the personal estate, if sufficient, and if not, out of his real estate, all just debts due from his ward," is controlling. But this statute does not determine what are the "just debts" of the ward, and cannot be reasonably interpreted to apply to a debt incurred by the ward which the guardian elects to avoid. If it were so applied, then the provision that the contracts of the ward are voidable by the guardian would lose practically all meaning. ORS 126.320 (3) was part of a general statute prescribing the duties of all guardians, including those of the "mentally ill." The contracts of persons of unsound mind who are under guardianship are generally absolutely void, Woerner, Guardianship 425. Were the plaintiff's

argument to prevail, it would follow that it would become the duty of the guardian of such a person to carry out the void contract of his ward. The "just debts" referred to evidently include those incurred for necessaries and, in the case of spendthrifts, those ratified by the guardian. They do not include those which the guardian is authorized to, and does, avoid.

Cases cited by the plaintiff in support of the contention that the guardian is estopped by his conduct to avoid the contract are far afield and do not call for discussion. None of them deal with guardians of spendthrifts or other incompetents. Were this an action against the guardian personally, the contention might require serious consideration, but we are not prepared to say that a guardian who is recreant to his duty can thereby render ineffectual the provisions of a statute governing the contracts of his ward.

 Nor can we yield to the argument that the defendants are liable under some theory of restitution. The case is wholly unlike *Petit v. Liston* and *Gaither v. Wallingford,* both supra, the holdings in which have been heretofore stated. This is not a suit for restitution, but an action on a check and even though it were construed to be the former, to permit recovery by the plaintiff as though that were the theory of the case would be nothing less than an evasion of the statute.

In *Sternlieb v. Normandie National Securities Corp.,* supra, Judge Crane made some observations about the policy of the law relative to infants' contracts as enunciated in his opinion in that case and, among other things, said:

> "As long as young men and women, under twenty-one years of age, having the semblance and appearance of adults, are forced to make a living and enter into business transactions, how are the

persons dealing with them to be protected if the infant's word cannot be taken or recognized at law? Are business men to deal with young people at their peril?" 263 NY at 250-251.

But he concluded:

"Well, the law is as it is, and the duty of this court is to give force and effect to the decisions as we find them. Some States have met the situation by legislation." Idem.

The New York court was dealing with the rules of the common law relating to infants' contracts as evolved by the courts. This case is governed by a statute and, whether the policy of this statute be salutary or otherwise, we have no choice but to give it "force and effect."

The judgment is affirmed.

SLOAN, J., dissenting.

Research has failed to produce any case law or other authority parallel to the instant case. So it is necessary to apply the law as it has been found to exist in respect to other legally disabled persons; the mental incompetents and infants. Having done so, I am caused to believe that a guardian is not conclusively exempt from judicial review of his avoidance of the wards' contracts.

The majority rely on the statute to conclude that only the guardian can decide when a claim against the wards' estate should be avoidable. I do not think we should read that restriction into the statutes. "A just debt"—ORS 126.320 (3) should mean something more than an obligation for necessaries. The reasons for that conclusion, briefly stated, are these:

The first is that the *ex parte* process by which guardians are appointed could enable a person, as in

the case before us, to consent to the appointment of a guardian, place his property behind the wall of that protection, and continue to do business to the cost and detriment of his creditors. Even if the creditors could set aside the guardianship because of fraud upon the court, not necessarily easy to prove, it still would put the creditors to the cost and delay of doing so. The situation mentioned is somewhat analogous to a person attempting to place his own property in a spendthrift trust for his own benefit. The courts have never permitted such a spendthrift trust. 1 Scott, Trusts, (1939) § 156, 782.

This is not to say that the guardian here was fraudulently appointed. That issue is not before us. But we do know that Kaufman placed property of substantial value in the hands of his guardian and then, without any interference by the guardian, Kaufman proceeded to enter into business transactions of sizable proportions.

Equity has not permitted the statute of frauds to stand in its way when unconscionable conduct would otherwise prevail. 4 Pomeroy's, Equity Jurisprudence, (5th ed 1941) § 1293. Although the present action is not in equity there is no reason why equitable principles should not apply. We should not read the statute so as to allow the unconscionable conduct present here.

Secondly, for more than 50 years the policy of the courts has been to impose more stringent limitations upon the right of an incompetent or an infant to avoid his contracts. This court has followed the trend. *Petit v. Liston,* 1920, 97 Or 464, 191 P 660, 11 ALR 487.

Authority always cited with confidence, verifies the above statement. Woodward, The Law of Quasi

Contracts, (1913 ed) § 67, 108, has this to say about incompetents:

"A contract possessing all the internal elements of validity may be invalidated by the fact that one of the parties thereto is regarded by the law as incompetent to contract. If either party, however, in the honest belief that the contract is binding, performs it in whole or in part, a benefit resulting to the other party therefrom is a benefit conferred in misreliance upon a non-existent contract right. Assuming that the other elements of quasi contractual obligation are present, such a benefit should be restored."

Williston, somewhat later said the same thing:

"In comparatively recent times many courts have made a still further departure from the view that a lunatic's contract is void because of his inability to give intelligent assent. In the leading case of Molton v. Camroux,* the rule was stated: 'The modern cases show that when that state of mind was unknown to the other contracting party, and no advantage was taken of the lunatic, the defense cannot prevail, especially where the contract is not merely executory but executed in the whole or in part and the parties cannot be restored altogether to their original positions.'* This rule had, at the time, the support of decisions in equity,* but went beyond what had been decided previously by courts of law. The rule is, however, in line with the view now generally prevailing in regard to mutual assent as a requirement for the formation of contracts. According to the modern view actual mental assent is not material in the formation of contracts, the important thing being what each party is justified in believing from the actions and words of the man he is dealing with.* Accordingly, if one dealing with a lunatic may reasonably suppose he is sane and makes a bargain with him on that assumption, there is no theoretical difficulty in the lack of mutual assent. Lunatics whose acts

can deceive anybody are not so totally devoid of will that their words and acts can be compared to talking while asleep or signing a paper substituted by sleight of hand. It is necessary, however, for reasons of justice, that the lunatic should be privileged to avoid the contract if it is oppressive. As this is a personal privilege it may well be limited to cases where otherwise there would be hardship. It is so limited by the rule of Molton v. Camroux, for if a lunatic has received fair consideration, of which he has had the benefit, and which he cannot restore, there is no hardship in treating the transaction as valid. Accordingly, the rule has not only been followed in England,* but has been much extended. In Molton v. Camroux the court confined its remarks strictly to the case of executed contracts, but in a later English case* all of the judges state without limitation that unless the mental incapacity was known to the other party insanity is no defense to an action on a contract; and Lord Esher says expressly 'whether it is executory or executed.' " 1 Williston, Contracts (Rev. ed., 1936), § 254, 746, 747. (Footnotes omitted).

In respect to infants Professor Williston urged the rule already adopted by this court, *Petit v. Liston,* supra:

"Though the weight of authority still permits an infant vendee to recover the price paid merely upon offering to return the property, if any, remaining in his hands, without accounting to the vendor for its depreciation or use,* there is an increasing number of jurisdictions which allow the vendor to deduct for such depreciation and use.* In view of the general education and early sophistication of youth, when minors commonly transact a considerable volume of business on their own behalf, the latter view which rests upon the equitable basis that, if the contract is fair and reasonable, then the minor should not be permitted to overreach any more than the adult seems clearly the

better. Some of these cases have emphasized the infant's misrepresentation of age, but this would seem merely an incidental step toward the recognition of the broader underlying principle.*" 1 Williston, Contracts, § 238, 705, 706, 707 (1936 ed). (Footnotes omitted).

The theory stated by Williston is not new. See 2 Kent, Commentaries, (14th ed, 1896), 356, Lecture XXXI.

When, as here, the victim of Kaufman's deceit is without the taint of any fraud or overreaching upon his part, he should not be barred by judicial sanction of that deceit. The statute should be and is for the protection of those afflicted with a lack of ability to control their impulses. It should not be construed to be a license to commit fraud upon the innocent.

O'CONNELL, J., dissenting.

The majority opinion treats ORS 126.335 as a legislative declaration that a spendthrift's contracts are voidable per se irrespective of the inequity which may result to the person with whom the spendthrift deals. It is not necessary to so construe the statute. It is more reasonable to assume that the legislature intended the word "voidable" to have a meaning similar to that attributed to it in other areas of the law involving a person's competency to contract. In those areas it is generally held that even though a contract with an incompetent person, such as an infant, is voidable, the promisee may be entitled to relief under certain circumstances. The case of *Petit v. Liston*, 97 Or 464, 191 P 660, 11 ALR 487 (1920) illustrates the principle. There it was held that an infant who disaffirmed a contract under which he was purchasing a motorcycle could not recover from the seller the

amount paid without compensating the seller for the use and depreciation of the motorcycle while it was in the infant's possession. Other cases apply the same principle and hold that an infant is entitled to recover only the difference between the amount paid under the contract and the benefits received by him.[1] The same result should obtain whether the infant brings the action to recover the purchase price or the seller seeks to recover for the unpaid benefits received by the infant.[2]

The foregoing cases are alluded to simply to show that the rule recognizing the voidability of contracts by incompetent persons is not absolute, and that the courts will hold them to their bargain if it would be inequitable not to do so. The same general principle should be followed in the application of ORS 126.335. The guardian should not be permitted to avoid the spendthrift's contracts in those situations where it would be inequitable to permit him to do so.

I believe that it would be inequitable to permit avoidance of the contract in the present case. Here the spendthrift had engaged in various business activities. To those not aware of the guardianship, Kaufman was just another person carrying on a business. There was nothing about him or his activities which would give warning of his status as a ward. To say, as the majority does, that guardianship proceedings give constructive notice of the ward's status is merely

---

[1] Riley v. Mallory, 33 Conn 201 (1886); Bailey v. Barnberger, 50 Ky 113 (1850); Adams v. Beal, 67 Md 53, 8 A 664 (1887); Berglund v. American Multigraph Sales Co., 135 Minn 67, 160 NW 191 (1916); Johnson v. Northwestern Mutual Life Ins. Co., 56 Minn 365, 59 NW 992 (1894); Rice v. Butler, 160 NY 578, 55 NE 275 (1899).

[2] Saccavino v. Gambardella, 22 Conn Supp 167, 164 A2d 304 (1960); Hall v. Butterfield, 59 N H 354, 47 Am Rep 209 (1879).

to state a conclusion. With equal ease it may be said that guardianship proceedings do not constitute constructive notice. Authority can be cited to support the latter view. Thus it has been held that insanity proceedings do not impart constructive notice of the promissor's incompetency to those who deal with one who has been adjudicated insane.[3]

If a person dealing with a spendthrift does not know of the guardianship and if the contract is beneficial to the spendthrift, the statute should not protect him. An analogy is found in the law of infant's contracts. It has been held that where a minor, who has all the appearances of having reached his majority, induces another to enter into a contract by misrepresenting his age, the minor may be estopped to repudiate the contract.[4] And an estoppel has been applied where there was no misrepresentation as to age but where the minor engaged in business as an adult and the promisee reasonably believed that the minor was legally capable of contracting.[5]

The competing interests of the spendthrift, his family and the county on one hand, and third persons dealing with the spendthrift on the other, must be considered in defining the scope of ORS 126.335. We cannot assume that the legislature, in its solicitude for those suffering from profligate habits, did not also consider the interest of innocent third persons who,

---

[3] General Pulaski Building & Loan Ass'n. v. Provident Trust Company of Philadelphia, 338 Pa 198, 12 A2d 336 (1940); Williams v. Jefferson Standard Life Ins. Co., 187 S C 103, 196 SE 519 (1938); 3 Merrill on Notice § 1119 (1952).

[4] Carney v. Southland Loan Company, 92 Ga App 559, 88 SE2d 805 (1955); R. J. Goerke Co. v. Nicolson, 5 NJS 412, 69 A2d 326 (1949); Reggiori v. Forbes, 128 NJL 391, 26 A2d 145 (1942); La Rosa v. Nichols, 92 NJL 375, 105 A 201, 6 ALR 412 (1918).

[5] First State Bank of Oakwood v. Edwards, 245 SW 478 (Tex Civ App 1922); Harseim v. Cohen, 25 SW 977 (Tex Civ App 1894).

without notice of the spendthrift's weakness and the guardianship which was created to protect him, dealt with the spendthrift to their detriment in a pecuniary way. The spendthrift deserves to be protected only to the extent that it is necessary to protect him from loss resulting from transactions inimical to his pecuniary interests. He should not receive protection under the statute if he has benefited from the transaction. I would interpret the statute to permit recovery from the spendthrift to the extent that the spendthrift was benefited by the transaction. In the present case this would allow plaintiff to recover the amount of money he contributed to the joint venture.

GOODWIN, J., joins in this dissent.